**FILED**

MAY 1 4 2009

Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SABRINA DE SOUSA <br> 1250 Connecticut Avenue <br> Suite 200 <br> Washington, DC 20036 <br><br> Plaintiff <br><br> v. <br><br> DEPARTMENT OF STATE <br> Washington, DC 20520 <br><br> and <br><br> HILLARY RODHAM CLINTON <br> Secretary of State <br> Department of State <br> Washington, DC 20520 <br><br> and <br><br> UNITED STATES OF AMERICA <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

Case: 1:09-cv-00896
Assigned To : Urbina, Ricardo M.
Assign. Date : 5/14/2009
Description: Admn. Agency Review

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

For nearly fifty years, the concepts of diplomatic and consular immunity have remained steadfast principles of international relations. However, the recent investigation and subsequent criminal proceedings by Italian authorities into the role of twenty-six United States Government ("USG") officials in an alleged "extraordinary rendition" in Milan, Italy six years ago has threatened to undermine those steadfast principles.

The Plaintiff Sabrina De Sousa ("De Sousa") is one of those USG officials. For three years, De Sousa has been forced to watch from the sidelines as the USG refused to

intervene on her behalf and affirmatively declare that she is immune from the Italian criminal proceedings. For three years, De Sousa has been intentionally deprived of any recourse to respond to the wide swath of allegations published by the media, particularly in both Italy and the United States. For three years, De Sousa has been ordered to remain silent and placed into a position where she has had to choose between her family overseas and her employment with the USG.

Effectively abandoned and left to fend for herself by the very government she had faithfully served for over a decade, De Sousa has brought this action against defendants Department of State, Hillary Rodham Clinton in her official capacity as Secretary of State, and the United States of America (collectively referred to herein as the "defendants") in order to seek vindication of her rights. She has brought this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201, the Administrative Procedures Act, 5 U.S.C. §701 et seq., the All Writs Act, 28 U.S.C. §1651, the Department of State's internal regulations and the Fifth Amendment to the U.S. Constitution.

## JURISDICTION

1.   This Court has jurisdiction over this matter pursuant to 5 U.S.C. §702 and 28 U.S.C. §1331.

## VENUE

2.   Venue is appropriate in the District under 5 U.S.C. §703 and 28 U.S.C. §1391.

## PARTIES

3.  Plaintiff Sabrina De Sousa ("De Sousa") was formerly employed by the Department of State as a Foreign Service Officer ("FSO"). Originally born in India, she became a naturalized U.S. citizen in 1985. De Sousa served as an FSO from 1998 to 2009, completing tours at the U.S. Embassy in Rome, Italy and the U. S. Consulate in Milan, Italy. Given the untenable position in which the defendants had placed her, she reluctantly resigned from the Department of State on February 13, 2009.

4.  Defendant Department of State ("DOS") is an agency as defined in 5 U.S.C. §701 and has arbitrary, capriciously and unlawfully refused to ensure that De Sousa is protected from foreign criminal prosecution by way of diplomatic/consular immunity and provided with legal representation.

5.  Defendant Secretary of State Hillary Rodham Clinton ("Secretary Clinton") has arbitrary, capriciously and unlawfully refused to ensure that De Sousa is protected from foreign criminal prosecution by way of diplomatic/consular immunity and provided with legal representation.

6.  Defendant United States of America is responsible for the actions and activities that led the refusal to provide De Sousa with diplomatic/consular immunity and/or with legal representation, as well as the refusal to permit her to travel overseas.

## BACKGROUND

### *History and Purpose of Diplomatic and Consular Immunity*

7.  Diplomatic/consular immunity is an integral part of U.S. law, U.S. foreign policy, U.S. ability to conduct international relations, and—by extension—U.S. political, legal, economic, and national security interests. Moreover, it reflects the basic principles of

3

fairness and due process embodied in U.S. democracy and constitutional norms. Accordingly, a failure by the USG to assert diplomatic/consular immunity for conduct by USG officials in the course of their official duties would erode both individual rights and our most basic constitutional and legal precepts.

8. Historically, diplomatic/consular immunity developed as an institution to maintain effective government relations, including during periods of political strain and even armed conflict. Thus, the origins of diplomatic/consular immunity are based on harmony and reciprocity: in adopting this doctrine, different nations were able to put aside their immediate unilateral interests in favor of a reciprocal cooperative regime that mutually benefited all nations in the long term. According to this doctrine, when a nation fails to assert diplomatic/consular immunity, the doctrine of diplomatic/consular immunity becomes marginally weaker.

9. To that end, a failure by the USG to ensure that designated USG officials receive diplomatic/consular immunity would potentially set a dangerous—indeed catastrophic—precedent for USG officials overseas. Not only would the USG's actions (or inaction) in failing to accord immunity have an unpredictable deterrent effect on morale and recruitment, but such actions would undoubtedly send an international message that other countries should feel free to prosecute USG officials simply for executing their official duties.

10. Such a result would contravene the United States' fundamental and historical priority of protecting U.S. interests and U.S. citizens. It was due to concerns about USG officials being subjected to unfair and/or politically-motivated prosecutions by an unaccountable international legal body that the U.S. has not ratified the Rome Statute of

4

the International Criminal Court. Precisely those same concerns underlie the rationale for having diplomatic/consular immunity.

11. For the purpose of reciprocity, the USG has set up clear and unambiguous procedures pertaining to the immunity of foreign government officials serving within the U.S. The Diplomatic Relations Act of 1978, 22 U.S.C. §254a, et seq., sets forth the particular procedures and principles underlying immunity for foreign government officials serving in the United States. Specifically, 22 U.S.C. §254d stipulates that any action brought against an individual who is entitled to immunity shall be dismissed subsequent to a motion by or on behalf of the individual that demonstrates that he/she is in fact entitled to immunity. A fundamental basis for setting up such unambiguous procedures is to ensure that USG official serving overseas are afforded the same treatment.

*The Vienna Convention on Diplomatic Relations*

12. The Vienna Convention on Diplomatic Relations of 1961 ("VCDR") encompasses the rights and privileges of diplomatic personnel of signatory States. Both the United States and Italy are signatories.

13. Pursuant to Article 1, a "diplomatic agent" is defined as a member of the diplomatic staff of an embassy.

14. Pursuant to Article 9, a receiving State may notify the sending State at any time and without explanation that a particular member of the diplomatic staff of the sending State has been declared *persona non grata*.

15. Pursuant to Article 29, a diplomatic agent is immune from arrest or detention.

16. Pursuant to Article 31, a diplomatic agent is immune from the criminal jurisdiction of the receiving State. However, the diplomatic agent remains subject to the criminal jurisdiction of the sending State.

17. Pursuant to Article 39(2), a diplomatic agent retains residual immunity without limitation of time for acts performed in the exercise of his/her official functions, even after the diplomatic agent ceases activity within the receiving State.

18. Pursuant to Article 32(2), any waiver of diplomatic immunity by the sending State with respect to a particular diplomatic agent must be express.

*The Vienna Convention on Consular Relations*

19. The Vienna Convention on Consular Relations of 1963 ("VCCR") encompasses the rights and privileges of consular personnel of signatory States. Both the United States and Italy are signatories.

20. Pursuant to Article 1, a "consular officer" is defined as any person entrusted with the exercise of consular functions.

21. Pursuant to Article 23, a receiving State may notify the sending State at any time that a consular officer of the sending State has been declared *persona non grata*.

22. Pursuant to Article 43(1), a consular officer is immune from the criminal and civil jurisdiction of the receiving State with respect to acts performed in the exercise of consular functions.

23. Pursuant to Article 53(4), a consular officer retains residual immunity without limitation of time for acts performed in the exercise of his/her official functions, even after the consular officer ceases activity within the receiving State.

24. Pursuant to Article 45(2), any waiver of consular immunity by the sending State with respect to a consular officer must be express and in writing.

*North Atlantic Treaty Organization Status of Forces Agreement*

25. The North Atlantic Treaty Organization Status of Forces Agreement ("NATO SOFA") encompasses jurisdictional matters pertaining to conduct by military personnel based in other NATO countries. Both the United States and Italy are signatories.

26. Pursuant to Article 1, the term "force" is defined as the military personnel belonging to one NATO country when in the territory of another NATO country in connection with their official duties. A "sending State" is defined as the NATO country to which the military personnel belong and a "receiving State" is defined as the NATO country in which the sending State's military personnel are located.

27. Pursuant to Article 7(1)(a), the military authorities of the sending State shall retain the right to exercise criminal and disciplinary jurisdiction conferred on them by the laws of the sending State over members of the force.

28. Pursuant to Article 7(3)(a)(ii), the military authorities of the sending State shall have the primary right to exercise jurisdiction over a member of the force in relation to offenses arising out of any act or omission done in the performance of official duty.

## FACTS

### *De Sousa's Background*

29. De Sousa was born in Bombay, India in 1955.

30. In 1985, De Sousa became a naturalized U.S. citizen.

31. De Sousa's biological family largely resides outside of the United States. Her mother, whose advanced age remains a constant concern, and one of her sisters live in India. Other siblings live in Europe and Canada.

32. Prior to joining DOS, De Sousa had already become skilled in mastering foreign languages. She maintained and continues to maintain multilingual conversational language capabilities and enjoys a broad range of international cultural exposure.

### *De Sousa's Employment Status in Italy*

33. In 1998, De Sousa was selected to serve as an FSO.

34. In August 1998, De Sousa was assigned to the U.S. Embassy in Rome, Italy as a Political Officer, Second Secretary. She was provided with a USG Diplomatic Passport that explicitly stated Sousa was abroad on a diplomatic assignment. Her position fell within the definition of a "diplomatic agent."

35. In May 2001, De Sousa was assigned to the U.S. Consulate in Milan, Italy as a Consul. She was provided with a USG Diplomatic Passport that explicitly stated De Sousa was abroad on a diplomatic assignment. Her position fell within the definition of a "consular officer." De Sousa's tour of duty was scheduled to end in May 2004.

### *The Alleged Kidnapping of Abu Omar and Resulting Criminal Proceedings*

36. On February 17, 2003, De Sousa was vacationing at a ski resort in Madonna di Campiglio, Italy, nearly 130 miles from Milan, Italy.

37. According to published news reports, on or about that same day, Hassan Mustafa Osama Nasr (also known as "Abu Omar"), was allegedly kidnapped in Milan, Italy by both USG and Italian intelligence officials. See *http://news.bbc.co.uk/2/hi/europe/ 6732897.stm* (last visited on May 5, 2009); *http://www.matthewacole.com/pdfs/ Blowback-GQ.pdf* (last visited May 7, 2009).

38. Abu Omar was allegedly flown to Egypt and subjected to interrogation, including torture. *http://www.washingtonpost.com/wp-dyn/content/article/2009/04/22/ AR2009042202059.html* (last visited May 5, 2009); *http://www.matthewacole.com/pdfs/ Blowback-GQ.pdf* (last visited May 7, 2009).

39. In January 2004, De Sousa's tour in Italy ended and she returned to the United States. She continued to work at DOS and took part in public policy coordination efforts.

40. In July 2005, Italian Prosecutor Armando Spataro issued arrest warrants for twenty-two (22) alleged Central Intelligence Agency ("CIA") operatives in relation to his investigation into the alleged kidnapping of Abu Omar. *http://www.washingtonpost.com/ wp-dyn/content/article/2005/12/04/AR2005120400885.html* (last visited May 5, 2009). In July 2006, an arrest warrant for De Sousa was issued; she was identified as one of the four main USG officials responsible for coordinating the alleged operation. See *http://www.statewatch.org /news/2006/oct/10italy-omar-case.htm* (last visited May 5, 2009).

41. On February 16, 2007, Judge Oscar Magi ("Judge Magi") in Milan, Italy indicted twenty-six (26) USG officials, including De Sousa, for their alleged role in the kidnapping of Abu Omar. *http://www.nytimes.com/2007/02/17/world/europe/17CIA.html ?_r=1&scp=1&sq=italy%20indicts%2031&st=cse* (last visited May 5, 2009). Abu

Omar, for his part, has brought a separate civil suit in Italy. *http://www.voanews.com /english/archive/2007-04/2007-04-05-voa52.cfm?CFID=202100850&CFTOKEN= 66790072&jsessionid=6630a0dd59bbe2ffc3476019171e652d7636* (last visited May 13, 2009).

42. De Sousa categorically denies having any involvement in the alleged kidnapping of Abu Omar. She also rejects the allegation that she was a principal planner of the alleged operation. Even if the allegations were true, though, her actions clearly fell within the scope of her official duties and thereby entitle her to diplomatic/consular immunity.

43. On June 8, 2007, Judge Magi convened criminal proceedings pertaining to the conduct of the twenty-six USG officials, as well as six Italian officials, in relation to the alleged kidnapping of Abu Omar. *http://news.bbc.co.uk/2/hi/europe/6732897.stm* (last visited May 5, 2009). Of the twenty-six USG officials, all are reportedly civilians with the exception of Air Force Lieutenant Colonel Joseph Romano ("LTC Romano"). See *http://www.alertnet.org/thenews/newsdesk/HRW/fe1d4abcec0c533e3020639615b98c7b.h tm* (last accessed May 7, 2009); *http://www.stripes.com/article.asp?section=104& article= 41068&archive=true* (last accessed May 7, 2009).

44. On March 11, 2009, Italy's Constitutional Court ruled that Italian prosecutors had violated state secrecy in gathering evidence for the criminal proceedings and deemed certain evidence inadmissible. *http://www.nytimes.com/2009/03/12/world/europe/ 12italy.html?_r=1&ref=world* (last accessed May 5, 2009). Italian prosecutors have publicly stated that the trial against the USG officials will still go forward. *http://www.latimes.com/news/nationworld/world/la-fg-italy-cia13-2009mar13,0, 5248749.story* (last visited May 12, 2009).

45. On April 22, 2009, Judge Magi adjourned the criminal proceedings until May 20, 2009, in order to consider requests from Italian government-appointed defense lawyers seeking to have the proceedings and indictments dismissed in their entirety. *http://uk.reuters.com/article/usTopNews/idUKTRE53L4V520090422?pageNumber=1&vi rtualBrandChannel=0* (last accessed May 5, 2009).

### Actions by the United States Government

46. Throughout the course of the criminal proceedings and while she remained an employee of DOS, De Sousa was instructed not to communicate with the Italian government-appointed defense lawyers representing her interests. She was also instructed not to speak to the media regarding the criminal proceedings or any aspect of the alleged kidnapping of Abu Omar.

47. At no point throughout the course of the criminal investigation and pending criminal proceedings has the USG, through Secretary Clinton or another appropriate USG official, intervened and declared that De Sousa enjoys diplomatic/consular immunity. Conversely, at no point has the USG, through Secretary Clinton or another appropriate USG official, expressly waived the diplomatic/consular immunity of De Sousa.

48. To date, the USG has not exercised its discretionary authority to bring criminal charges against De Sousa for her alleged involvement in the alleged kidnapping of Abu Omar. Upon information and belief, the USG has concluded that, even if the allegations are true, De Sousa's conduct did not constitute a criminal offense under U.S. law.

49. At no point throughout the course of the criminal investigation and pending criminal proceedings has the USG provided De Sousa with legal representation or any manner of communication with her Italian government-appointed lawyers.

50. The Department of Defense has arranged for legal representation for LTC Romano. See *http://www.radioradicale.it/scheda/255891/processo-per-il-rapimento-dellex-imam-abu-omar* (last visited May 9, 2009). The USG has not invoked the NATO SOFA. Upon information and belief, Romano is the only USG official receiving legal assistance from any agency of the USG.

51. To date, there is still a pending EUROPOL warrant for De Sousa's arrest. If she attempts to enter any country within the European Union, she will immediately be arrested. If she enters into any other countries, she risks the possibility that those countries will choose to arrest and extradite her to Italy. In effect, De Sousa runs the risk of arrest and detention if she ever leaves the territorial sovereignty of the United States.

52. At no point has the DOS conducted a fact-finding investigation of its own regarding the alleged kidnapping that involved collecting information directly from De Sousa. Upon information and belief, DOS has not conducted any investigations into this matter at all.

53. At no point has DOS convened any manner of an internal name-clearing hearing involving De Sousa that would permit her to refute (even if only to USG officials) the allegations currently arrayed against her by Italian authorities.

54. Upon information and belief, the full spectrum of charges alleged by the Italian authorities, including the alleged conduct that forms the basis for the charges, are detailed in De Sousa's personnel and/or security files.

*The U.S. and International Media Reporting*

55. Media reports on the alleged kidnapping of Abu Omar have been widespread, particularly in Europe and the United States. See generally STEPHEN GREY, GHOST PLANE: THE TRUE STORY OF THE CIA TORTURE PROGRAM (St. Martin's Press, 2006); Matthew Cole, *Blowback*, Gentleman's Quarterly, March 2007; *http://news.bbc.co.uk/2/hi/europe/6732897.stm* (last accessed on May 5, 2009); *http://www.lefigaro.fr/international/20060224.FIG000001516_auditions_sur_le_rapt_d_un_imam_par_la_cia. html* (last accessed May 10, 2009); *http://www.nytimes.com/2005/06/26/international/europe/26milan.html?pagewanted=1* (last visited May 12, 2009); *http://www.washingtonpost.com /wp-dyn/content/article/2007/02/27/AR200702270 1160.html* (last visited May 12, 2009). Upon information and belief, in light of the widespread interest in his "Blowback" article, Matthew Cole is set to publish a book in Fall 2009 on the entire Abu Omar controversy.

56. European media outlets have published articles providing inaccurate descriptions of De Sousa, alluding to the notion that she was the principal planner of the alleged kidnapping of Abu Omar. These descriptions have also included depictions of her personality that have included nicknames such as "The Tiger" and "Mata Hari." See e.g. *http://www.corriere.it/Primo_Piano/Cronache/2006/07_Luglio/09/0limipi0.shtml* (last visited May 10, 2009); *http://archiviostorico.corriere.it/2005/luglio/05/ Quei_complimenti_della_Cia_Sismi_co_9_050705038.shtml* (last visited May 10, 2009).

*De Sousa's Decision to Resign*

57. By July 2006, having exhausted all available internal mechanisms, De Sousa began seeking assistance from then-Secretary of State Condoleezza Rice by way of written letters. Specifically, she requested that the USG formally invoke diplomatic/consular immunity with respect to De Sousa's alleged involvement in the kidnapping of Abu Omar and provide her with legal representation to counter the charges in the Italian criminal proceedings. She never received a response.

58. In March 2008, having not seen her family for over a year, De Sousa used her available annual leave and traveled to India.

59. In October 2008, De Sousa wished to visit her family in India again. She sought permission to travel using annual leave hours, but her request was denied. She was informed that any travel arrangements she made outside of the United States could jeopardize both her safety and that of other USG officials. Specifically, De Sousa was informed that the pending Italian criminal proceedings and EUROPOL warrant raised the risk of her possible arrest and extradition to Italy. It was De Sousa's understanding that if she traveled to India in any capacity, she would risk termination of her employment.

60. After the inauguration of President Barack Obama and the appointment of Secretary Clinton, De Sousa attempted one last time to seek assistance with respect to the criminal proceedings in Italy. In a letter to Secretary Clinton which De Sousa also forwarded to U.S. Attorney General Eric Holder and several Congressional committees, De Sousa emphasized the need for assistance by noting that her ability to travel to India to visit her family had been restricted specifically because of the pending criminal proceedings. De Sousa did not receive a response.

61. As long as the Italian criminal proceedings remain ongoing, De Sousa's ability to travel outside of the United States is risky at best and dangerous at worst. If she attempts to enter any country within the European Union, she will be immediately arrested pursuant to the pending EUROPOL warrant. If she enters any other foreign country with an extradition treaty with Italy (or even the European Union as a whole), she faces the risk of detention and extradition to Italy. In effect, De Sousa is unable to ever leave the United States, whether to visit her family members or for business, as long as the Italian criminal proceedings are ongoing.

62. In addition, De Sousa will be required to list the Italian criminal proceedings, the EUROPOL warrant, and even Abu Omar's civil suit against her on even the most rudimentary job applications and background investigation forms, thereby severely restricting her options for future employment in her chosen profession.

63. In effect, as long as the criminal proceedings continue unabated, De Sousa's ability to travel and pursue her chosen career is effectively in ruins by no fault of her own.

64. In February 2009, De Sousa made the decision that she could no longer agree to remain a USG employee as long as the USG refused to either protect her from the pending Italian criminal proceedings, provide her with legal representation to counter the charges or even permit her to visit her family overseas. Consequently, De Sousa tendered her resignation on February 13, 2009.

## FIRST CAUSE OF ACTION
### (ADMINISTRATIVE PROCEDURES ACT – INVOCATION OF IMMUNITY)

65. De Sousa repeats the allegations contained in paragraphs 33 through 64 above, inclusive.

66. In 1998, De Sousa was selected to serve as an FSO.

67. As an FSO, De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

68. In August 1998, De Sousa was assigned to the U.S. Embassy in Rome, Italy as a Political Officer, Second Secretary. In May 2001, De Sousa was selected to serve as a Consul of the United States Consulate in Milan, Italy.

69. As an FSO serving overseas, Sousa was entitled to all aspects of diplomatic and consular immunity conferred upon diplomatic agents and consular officers by way of the VCDR and VCCR, respectively. Sousa was provided a valid Diplomatic U.S. Passport by the USG for work-related purposes which verified that she retained diplomatic/consular immunity.

70. On February 16, 2007, Judge Magi formally indicted De Sousa for involvement in the alleged kidnapping of Abu Omar.

71. De Sousa's alleged involvement, even if true, clearly fell within the scope of her official duties and thereby entitles her to diplomatic/consular immunity.

72. To date, the USG has refused to assert diplomatic/consular immunity for De Sousa and has failed to ensure that legal representation is provided for her to counter these charges. The USG has not, at any point, issued an express waiver of De Sousa's diplomatic/consular immunity.

73. The defendants committed and undertook actions that were arbitrary, capricious and/or an abuse of discretion pertaining to De Sousa, including, but not limited to, their failure to invoke diplomatic/consular immunity for De Sousa and provide her with legal representation. These acts are unwarranted by the facts, unsupported by substantial evidence and in violation of internal regulations, thereby causing De Sousa to suffer legal wrongs under the Administrative Procedures Act.

74. The USG's actions caused and continue to cause De Sousa significant emotional, professional and economic harm, including, but not limited to, possible criminal or civil liability.

## SECOND CAUSE OF ACTION
### (FIFTH AMENDMENT LIBERTY INTEREST)

75. De Sousa repeats the allegations contained in paragraphs 33 through 64 above, inclusive.

76. As an FSO, De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

77. In August 1998, De Sousa was assigned to the U.S. Embassy in Rome, Italy as a Political Officer, Second Secretary. In May 2001, De Sousa was selected to serve as a Consul of the United States Consulate in Milan, Italy.

78. As an FSO serving overseas, Sousa was entitled to all aspects of diplomatic and consular immunity conferred upon diplomatic agents and consular officers by way of the VCDR and VCCR, respectively. De Sousa was provided a valid Diplomatic U.S. Passport by the USG for work-related purposes which verified that she retained diplomatic/consular immunity.

79. On February 16, 2007, Judge Magi formally indicted De Sousa for involvement in the alleged kidnapping of Abu Omar.

80. De Sousa's alleged involvement, even if true, clearly fell within the scope of her official duties and thereby entitles her to diplomatic/consular immunity.

81. On February 13, 2009, De Sousa resigned from the DOS.

82. By way of their actions, or deliberate inaction, the defendants have permitted inaccurate and defamatory information regarding De Sousa to be publicly reported world-wide. This information has publicly impugned De Sousa's reputation such that she can no longer work effectively in her chosen profession. The facts regarding De Sousa's conduct are verifiable yet the defendants have not taken any action to verify and/or refute them, nor have they taken any action to formally invoke diplomatic/consular immunity on behalf of De Sousa.

83. To that end, the defendants have failed to accord De Sousa any semblance of due process and denied her full administrative rights, including diplomatic/consular immunity and an internal name-clearing hearing, to which she is entitled. As a consequence of the defendants' conduct and with her career in ruins, De Sousa was effectively forced to resign. In effect, the defendants' actions—or lack thereof—caused a constructive adverse change in Sousa's employment status.

84. The defendants, by way of their unlawful and/or unethical actions, constructively forced De Sousa to resign. These actions included, but were not limited to, the USG's apparently deliberate failure to correct or otherwise address the false and defamatory information being publicly disseminated across the world regarding De Sousa's conduct, and to invoke her right to diplomatic/consular immunity. The dissemination of derogatory

information, combined with the ongoing criminal proceedings in Italy, served as the catalyst for De Sousa's resignation and has seriously damaged her reputation. Accordingly, De Sousa has been deprived of her liberty to work in her chosen profession.

85. The defendants are not authorized to deny an individual "Liberty" without "due process of law" in contravention of the Fifth Amendment. Because De Sousa was not afforded due process rights before or after she was constructively forced to resign, she was deprived of the ability to challenge the accuracy of the evidence underlying the criminal indictment in Italy and which can be found within her personnel and/or security files at DOS.

86. The defendants' actions have consequently automatically excluded De Sousa from participating in her chosen profession. Should De Sousa apply to work for a federal agency or a private civilian employer for a position that requires even the most rudimentary background investigation, she will be forced to reveal that she faces criminal charges and a civil suit in Italy, as well as the pending EUROPOL arrest warrant. In addition, the USG will disseminate information it maintains about De Sousa's conduct, to include known inaccurate and false information that will adversely impact upon her reputation and chances for additional employment opportunities. As a result, the defendants have effectively stigmatized De Sousa and impugned her reputation, broadly precluded her from pursuing her chosen profession and imposed a "status change" upon her that has implicated her liberty interests.

87. The defendants are not permitted to violate De Sousa's Constitutional rights, as set forth by the Constitution of the United States.

88. As a result, De Sousa has suffered adverse and harmful effects, including but not limited to, lost or jeopardized present or future professional and financial opportunities, as well as the threat of criminal prosecution if she ever leaves the territorial boundaries of the United States.

**THIRD CAUSE OF ACTION**
**(FIFTH AMENDMENT –**
**FREEDOM TO TRAVEL OUTSIDE THE UNITED STATES)**

89. De Sousa repeats the allegations contained in paragraphs 33 through 64 above, inclusive.

90. As an FSO, De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

91. In August 1998, De Sousa was assigned to the U.S. Embassy in Rome, Italy as a Political Officer, Second Secretary. In May 2001, De Sousa was selected to serve as a Consul of the United States Consulate in Milan, Italy.

92. As an FSO serving overseas, Sousa was entitled to all aspects of diplomatic and consular immunity conferred upon diplomatic agents and consular officers by way of the VCDR and VCCR, respectively. De Sousa was provided a valid Diplomatic U.S. Passport by the USG for work-related purposes which verified that she retained diplomatic/consular immunity.

93. On February 16, 2007, Judge Magi formally indicted De Sousa for involvement in the alleged kidnapping of Abu Omar.

94. De Sousa's alleged involvement, even if true, clearly fell within the scope of her official duties and thereby entitles her to diplomatic/consular immunity.

95. To date, the USG has refused to assert diplomatic/consular immunity for De Sousa and has failed to ensure that legal representation is provided for her to counter these charges. The USG has not, at any point, issued an express waiver of De Sousa's diplomatic/consular immunity.

96. On February 13, 2009, De Sousa resigned from the DOS.

97. The defendants have failed to accord De Sousa due process and denied her full administrative rights, including diplomatic/consular immunity, to which she is entitled. As a result of the defendants' conduct—or lack thereof—De Sousa is no longer able to travel outside the territorial boundaries of the United States, as she risks arrest and criminal prosecution under the EUROPOL warrant. Therefore, the defendants have effectively deprived De Sousa of her constitutional liberty interest in travel without due process of the law in violation of the Fifth Amendment.

98. Moreover, De Sousa's inability to travel effectively precludes her from pursuing a career in her chosen field in foreign affairs. Without the ability to travel, De Sousa is unable to obtain numerous jobs in this field, including but not limited to diplomat, envoy, attaché, consultant, and a career in international business.

99. The defendants are not permitted to violate De Sousa's Constitutional rights as set forth by the Constitution of the United States.

100. As a result, De Sousa has suffered adverse and harmful effects, including but not limited to, lost or jeopardized professional and financial opportunities, as well as the threat of criminal prosecution if she ever leaves the territorial boundaries of the U.S.

WHEREFORE, De Sousa requests that the Court award her the following relief:

(1) Require the USG to formally invoke diplomatic and/or consular immunity on behalf of De Sousa and provide her with legal representation with respect to both the criminal and civil proceedings in Italy;

(2) Declare and find that the defendants violated the Administrative Procedures Act by failing to comply with internal rules and regulations with respect to invoking and asserting diplomatic and/or consular immunity on behalf of De Sousa;

(3) Declare and find that the defendants violated De Sousa's liberty interest under the Fifth Amendment to the Constitution;

(4) Require the defendants to provide De Sousa with a name-clearing hearing in which De Sousa can refute and/or challenge the accuracy of the information underlying the criminal and civil proceedings in Italy that constructively forced her to resign;

(5) Declare and find that the defendants violated De Sousa's liberty interest in traveling and pursuing a career dependent on travel under the Fifth Amendment to the Constitution;

(6) Invoke its equitable powers to expunge all records or information that are inaccurate, derogatory or infringe upon De Sousa's express or implied constitutional or statutory rights;

(7) Require the defendants to reimburse De Sousa for all associated expenses to resolve these disputes;

(8) Award De Sousa the costs of the action and reasonable attorney fees under the Equal Access to Justice Act, 5 U.S.C. § 552a(g)(4)(B), or any other applicable law; and

(9) Grant such other relief as the Court may deem just and proper.

Date:  May 13, 2009

Respectfully submitted,

Bradley P. Moss, Esq.
D.C. Bar #975905
Ilana S. Greenstein, Esq.
D.C. Federal Bar #MD9622
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 907-7945