# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | * | |
| SABRINA DE SOUSA | * | |
| 1250 Connecticut Avenue | * | |
| Suite 200 | * | |
| Washington, DC 20036 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| DEPARTMENT OF STATE | * | |
| Washington, DC 20520 | * | |
| | * | |
| and | * | |
| | * | |
| HILLARY RODHAM CLINTON | * | |
| Secretary of State | * | |
| Department of State | * | |
| Washington, DC 20520 | * | |
| | * | |
| and | * | Civil Action No. 09-896 (RMU) |
| | * | |
| DEPARTMENT OF JUSTICE | * | |
| Washington, DC 20530 | * | |
| | * | |
| and | * | |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| Washington, DC 20505 | * | |
| | * | |
| and | * | |
| | * | |
| ROBERT SELDON LADY | * | |
| Unknown Address | * | |
| Unknown Address | * | |
| | * | |
| and | * | |
| | * | |
| JEFFREY CASTELLI | * | |
| 11914 Fawn Ridge Lane | * | |
| Reston, VA 20194-1119 | * | |
| | * | |
| and | * | |
| | * | |

|                                         |     |
|-----------------------------------------|-----|
|                                         | *   |
| SUSAN CZASKA                            | *   |
| 701 Glynn Springs Drive                 | *   |
| Williamsburg, VA 23188                  | *   |
|                                         | *   |
| and                                     | *   |
|                                         | *   |
| UNITED STATES OF AMERICA                | *   |
|                                         | *   |
| Defendants.                             | *   |
|                                         | *   |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## FIRST AMENDED COMPLAINT

This case arises out of criminal indictments issued against twenty-six United States Government ("USG") officials in an Italian court concerning the alleged kidnapping and extraordinary rendition of a suspected terrorist in 2003. The Plaintiff Sabrina De Sousa ("De Sousa") is one of those USG officials and, in light of the USG's refusal to affirmatively stipulate whether De Sousa is entitled to diplomatic/consular immunity, has found herself in the position of an international fugitive. Indeed, the actions (or lack thereof) by the USG have placed all USG officials currently serving overseas under the auspices of diplomatic/consular immunity in a position of uncertainty concerning whether the USG will actually take affirmative action to protect them from foreign authorities.

Effectively abandoned and left to fend for herself by the very government she had faithfully served for over a decade, De Sousa has brought this action in order to seek vindication of her rights and to hold accountable both the USG officials and agencies whose actions (or lack thereof) have destroyed her career and placed her in criminal jeopardy. She has brought this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201, the Administrative Procedures Act, 5 U.S.C. §701 et seq., the All Writs

Act, 28 U.S.C. §1651, the Westfall Act, 28 U.S.C. § 2679 et seq., the Department of State's regulations and the Fifth Amendment to the U.S. Constitution.

## JURISDICTION

1.   This Court has jurisdiction over this matter pursuant to 5 U.S.C. §702 and 28 U.S.C. §1331.

## VENUE

2.   Venue is appropriate in the District under 5 U.S.C. §703 and 28 U.S.C. §1391.

## PARTIES

3.   Plaintiff Sabrina De Sousa ("De Sousa") was formerly employed by the Department of State as a Foreign Service Officer ("FSO"). Originally born in India, she became a naturalized U.S. citizen in 1985. De Sousa served as an FSO from 1998 to 2009, completing tours at the U.S. Embassy in Rome, Italy and the U. S. Consulate in Milan, Italy. Given the untenable position in which the defendants had placed her, she reluctantly resigned on February 13, 2009.

4.   Defendant Department of State ("DOS") is an agency as defined in 5 U.S.C. §701 and committed the actions set forth in the paragraphs below.

5.   Defendant Secretary of State Hillary Rodham Clinton ("Secretary Clinton") committed the actions set forth in the paragraphs below.

6.   Defendant Department of Justice ("DOJ") is an agency as defined in 5 U.S.C. § 701 and committed the actions set forth in the paragraphs below.

7.   According to published news reports, defendant Central Intelligence Agency ("CIA") committed the actions set forth in the paragraphs below.

8.   According to published news reports, defendant Robert Seldon Lady ("Lady") committed the actions set forth in the paragraphs below.

9.   According to published news reports, defendant Jeffrey Castelli ("Castelli") committed the actions set forth in the paragraphs below.

10. According to published news reports, defendant Susan Czaska ("Czaska") committed the actions set forth in the paragraphs below.

11. Defendant United States of America is responsible for the actions and activities set forth in the paragraphs below.

## FACTS

### De Sousa's Background

12. De Sousa was born in Bombay, India in 1955.

13. In 1985, De Sousa became a naturalized U.S. citizen.

14. De Sousa's biological family largely resides outside of the United States. Her mother, whose advanced age remains a constant concern, and one of her sisters live in India. Other siblings live in Europe and Canada.

15. Prior to joining DOS, De Sousa had already become skilled in mastering foreign languages. She maintained and continues to maintain multilingual conversational language capabilities and enjoys a broad range of international cultural exposure.

### De Sousa's Employment Status in Italy

16. In 1998, De Sousa was selected to serve as an FSO.

17. In August 1998, De Sousa was assigned to the U.S. Embassy in Rome, Italy as a Political Officer, Second Secretary. She was provided with a USG Diplomatic Passport that explicitly stated Sousa was abroad on a diplomatic assignment.

4

18. In May 2001, De Sousa was assigned to the U.S. Consulate in Milan, Italy as a Vice Consular Officer. She was provided with a USG Diplomatic Passport that explicitly stated De Sousa was abroad on a diplomatic assignment. De Sousa's tour of duty was scheduled to end in May 2004.

*The Alleged Kidnapping and Extraordinary Rendition of Abu Omar*

19. On February 17, 2003, De Sousa was vacationing at a ski resort in Madonna di Campiglio, Italy, nearly 130 miles from Milan, Italy.

20. According to published news reports, on or about that same day, Hassan Mustafa Osama Nasr (also known as "Abu Omar"), was allegedly kidnapped in Milan, Italy by both USG and Italian intelligence officials. See *http://news.bbc.co.uk/2/hi/europe/ 6732897.stm* (last visited on May 5, 2009); *http://www.matthewacole.com/pdfs/ Blowback-GQ.pdf* (last visited December 14, 2009).

21. Abu Omar was allegedly flown to Egypt and subjected to interrogation, including torture. *http://www.washingtonpost.com/wp-dyn/content/article/2009/04/22/ AR2009042202059.html* (last visited May 5, 2009); *http://www.matthewacole.com/pdfs/ Blowback-GQ.pdf* (last visited December 14, 2009).

22. Former CIA analyst Michael Scheuer has stated that the Italian military secret service (also known as "SISMI") approved the alleged operation. See *http://www.cnn. com/2009/WORLD/europe/ 11/04/italy.rendition.verdict/index.html* (last visited December 22, 2009). In 2005, an unidentified CIA source informed the media that the CIA had allegedly briefed and sought approval from the SISMI prior to conducting the alleged operation. See Id.

23. In January 2004, De Sousa's tour in Italy ended and she returned to the United States. She continued to work at DOS and took part in policy coordination efforts.

24. In April 2004, Italian Prosecutor Armando Spataro ("Spataro") began investigating the alleged operation after a phone call between Abu Omar and his wife was intercepted. *http://www.matthewacole.com/pdfs/ Blowback-GQ.pdf* (last visited December 14, 2009). In the phone call, Abu Omar explains that he had been kidnapped, that the captors had been English and Italian-speaking men and that he had been put on a plane with an American flag on it. Id.

25. Using mobile positioning software, Spataro identified 17 active cell phones that were at the location of the alleged operation. Id. Those cell phones had all been activated around the same time and deactivated shortly after the alleged extraordinary rendition of Abu Omar. Id. Several calls to CIA Headquarters in Langley, VA had been made from the cell phones. Id.

26. Spataro was able to use the cell phone information to trace the movements of the alleged CIA officials for the time in which they had been in Milan. Id. Spataro checked the hotel registers and found several aliases which listed the already-identified cell phone numbers as contact numbers for the hotel. Id. Spataro was able to match those aliases to rental cars, passport photocopies, and credit cards. Id. In a word, Spataro had "uncovered nearly every trick the CIA uses to facilitate its operations … some of America's most closely guarded secrets." Id.

27. The unflattering descriptions of the alleged sloppiness of the CIA's alleged operation are plentiful. Two officials used their cell phones to call home. Id. Two other officials used the trip for romantic encounters in hotels in Milan. Id. One official used his

real name when checking into a hotel. Id. Former CIA officer Bob Baer ("Baer")

described the operation as having thrown all caution to the wind. See

*http://abcnews.go.com/Blotter/exclusive-convicted-cia-spy-broke-law/story?id=8995107*

(last visited December 22, 2009). Lady later expressed regret at the "big trail of

evidence" that had been left for the investigators. See *http://www.reuters.com/article*

*/idUSTRE55T3H420090630* (last visited December 22, 2009).

28.   A former senior CIA official stated that responsibility for the operation, including

the manner in which operational security was maintained, fell upon Castelli, the alleged

CIA Station Chief in Rome, Italy. *http://www.matthewacole.com/pdfs/ Blowback-GQ.pdf*

(last visited December 14, 2009). This former official noted that Castelli was aware of the

ongoing sloppiness but failed to alert the CIA. Id.

29.   Spataro's investigation ultimately led him to Lady. Id. In mid-2005, Spataro

raided Lady's Italian villa and found, on Lady's home computer, the flight itinerary to

Egypt, an e-mail from a former U.S. consular official advising him to flee Italy, and a

surveillance photo of Abu Omar taken one month prior to the alleged operation in the

same location in which the alleged operation took place. Id.

30.   Abu Omar ultimately was not charged with a crime and was released in February

2007. See *http://www.allgov.com/ViewNews/Accused_CIA_Agent_Sues_for_*

*Diplomatic_Immunity_90602* (last visited December 22, 2009); *http://abcnews.go.com/*

*Blotter/exclusive-convicted-cia-spy-broke-law/story?id=8995107* (last visited December

22, 2009). Baer commented on the fact that Abu Omar was the "wrong guy." See

*http://abcnews.go.com/Blotter/exclusive-convicted-cia-spy-broke-law/story?id=8995107*

(last visited December 22, 2009).

*The Italian Criminal and Civil Proceedings*

31. In July 2005, Spataro issued arrest warrants for twenty-two (22) alleged CIA operatives in relation to his investigation into the alleged kidnapping of Abu Omar. *http://www.washingtonpost.com/ wp-dyn/content/article/2005/12/04/AR20051 20400885.html* (last visited May 5, 2009). Arrest warrants were also issued for nine (9) Italian officials, all of whom allegedly are employed by SISMI, for their own alleged involvement. See *http://www.statewatch.org/news/2006/oct /10italy-omar-case.htm* (last visited December 14, 2009). In July 2006, an arrest warrant for De Sousa was issued; she was identified as one of the four main USG officials responsible for planning or coordinating the alleged operation. Id.

32. On February 16, 2007, Judge Oscar Magi ("Judge Magi") in Milan, Italy indicted twenty-six (26) USG officials, including De Sousa, for their alleged role in the alleged kidnapping of Abu Omar. *http://www.nytimes.com/2007/02/17/world/europe/17CIA.html ?_r=1&scp=1&sq=italy%20indicts%2031&st=cse* (last visited May 5, 2009). Abu Omar, for his part, has brought a separate civil suit in Italy. *http://www.voanews.com /english/archive/2007-04/2007-04-05-voa52.cfm?CFID=202100850&CFTOKEN= 66790072&jsessionid=6630a0dd59bbe2ffc3476019171e652d7636* (last visited May 13, 2009).

33. De Sousa categorically denies having any involvement in the alleged kidnapping of Abu Omar. She also rejects the allegation that she was a principal planner of the alleged operation. Even if the allegations were true, though, her actions clearly fell within the scope of her official duties and thereby entitle her to diplomatic/consular immunity.

34. On June 8, 2007, Judge Magi convened criminal proceedings pertaining to the conduct of the twenty-six USG officials, as well as six Italian officials, in relation to the alleged kidnapping of Abu Omar. *http://news.bbc.co.uk/2/hi/europe/6732897.stm* (last visited May 5, 2009). Of the twenty-six USG officials, all are reportedly civilians with the exception of Air Force Lieutenant Colonel (now Colonel) Joseph Romano ("Col. Romano"). See *http://www.alertnet.org/thenews/newsdesk/HRW/ fe1d4abcec0c533e 3020639615b98c7b.htm* (last accessed May 7, 2009); *http://www.stripes.com/article.asp? section=104&  article= 41068&archive=true* (last accessed May 7, 2009).

35. On March 11, 2009, Italy's Constitutional Court ruled that Italian prosecutors had violated state secrecy in gathering evidence for the criminal proceedings and deemed certain evidence inadmissible. *http://www.nytimes.com/2009/03/12/world/europe/ 12italy.html?_r=1&ref=world* (last accessed May 5, 2009). Italian prosecutors publicly stated that the trial against the USG officials would still go forward. *http://www.latimes. com/news/nationworld/world/la-fg-italy-cia13-2009mar13,0, 5248749.story* (last visited May 12, 2009).

36. On April 22, 2009, Judge Magi adjourned the criminal proceedings until May 20, 2009, in order to consider requests from Italian government-appointed defense lawyers seeking to have the proceedings and indictments dismissed in their entirety. *http://uk.reuters.com/article/usTopNews/idUKTRE53L4V520090422?pageNumber=1&vi rtualBrandChannel=0* (last accessed May 5, 2009).

37. On May 20, 2009, Judge Magi ruled that he would permit the criminal proceeding to continue. *http://www.cbsnews.com/stories/2009/05/20/world/main5026822.shtml* (last accessed December 7, 2009).

38. On November 4, 2009, Judge Magi issued convictions for twenty-three of the USG officials, including De Sousa. *http://www.nytimes.com/2009/11/05 /world/ europe/05italy.html?_r=1* (last accessed December 7, 2009). Judge Magi sentenced Lady to an eight year sentence and sentenced De Sousa (and the other twenty-one USG officials) to a five year sentence. Id. Judge Magi separately ruled that Castelli and two other USG officials were entitled to diplomatic immunity and therefore could not be convicted. Id. To date, the USG has not publicly stated whether or not it invoked diplomatic immunity for those three USG officials.

39. Abu Omar and wife were also awarded monetary damages in their related civil proceeding against De Sousa and the other USG officials in the combined amount of $1.5 million. See *http://legalift.wordpress.com/2009/11/05/historic-abu-omar-rendition-trial-ends-with-conviction-of-cia-officers-for-abduction/* (last visited December 22, 2009).

*Actions by the DOS/DOJ/CIA*

40. Throughout the course of the criminal proceedings and while she remained an employee of DOS, De Sousa was instructed not to communicate with the Italian government-appointed defense lawyer representing her interests. She was also instructed not to speak to the media regarding the criminal proceedings or any aspect of the alleged kidnapping of Abu Omar.

41.  At no point throughout the course of the criminal investigation and criminal proceedings did the USG, through Secretary Clinton or another appropriate USG official, intervene and affirmatively stipulate whether De Sousa's alleged actions (if true) fell within the scope of her employment and subsequently invoked or expressly waived diplomatic/consular immunity on behalf of De Sousa.

42. To date, the USG has not exercised its discretionary authority to bring criminal charges against De Sousa for her alleged involvement in the alleged kidnapping of Abu Omar. Upon information and belief, the USG has concluded that, even if the allegations are true, De Sousa's conduct did not constitute a criminal offense under U.S. law.

43. To date, the CIA has refused to comment on the allegations surrounding the alleged kidnapping of Abu Omar. See *http://www.cnn.com/2009/WORLD/ europe/11/04/italy.rendition.verdict/index.html* (last visited December 22, 2009); *http://legalift.wordpress.com/2009/11/05/historic-abu-omar-rendition-trial-ends-with-conviction-of-cia-officers-for-abduction/* (last visited December 22, 2009).

44. Not until August 26, 2009, after the criminal proceedings had been ongoing for over three years and only subsequent to the initiation of the present litigation, did USG finally provide De Sousa with legal representation. Specifically, the DOJ agreed to pay associated expenses for De Sousa to hire private Italian counsel to represent her in the final stages of the criminal proceedings.

45. The Department of Defense, for its part, arranged for legal representation for Col. Romano in the early stages of the criminal proceeding, including providing him with three U.S. military lawyers. See *http://www.radioradicale.it/scheda/255891/processo-per-il-rapimento-dellex-imam-abu-omar* (last visited May 9, 2009).

47. On September 22, 2009, U.S. Air Force Staff Judge Advocate Lieutenant Colonel Roger M. Welsh ("LTC Welsh") informed the Italian Minister of Justice that the Department of the Air Force was invoking paragraph 3(a)(ii) of Article VII of the North Atlantic Treaty Organization Status of Forces Agreement ("NATO SOFA") with respect to the criminal charges arrayed against Col. Romano. See *http://www.reuters.com/article*

*/idUSTRE58M5YO20090923* (last accessed December 11, 2009). In the letter, LTC Welsh stated that, in light of the fact that the criminal charges allege that the actions of Col. Romano occurred in his official capacity, the USG was asserting its primary right under the NATO SOFA to exercise criminal jurisdiction over Col. Romano. See *http://www.cqpolitics.com/cq-assets/cqmultimedia/pdfs/20090923letter.pdf* (last accessed December 11, 2009). Upon information and belief, Col. Romano is the only USG official for whom the USG has publicly affirmatively certified that any alleged conduct fell within the scope of employment and consequently rendered the USG official immune from foreign prosecution.

48. At no point has the DOS conducted a publicly-disclosed fact-finding investigation of its own regarding the alleged kidnapping that involved collecting information directly from De Sousa. Upon information and belief, DOS has not conducted any investigation into this matter at all.

49. At no point has DOS convened any manner of an internal name-clearing hearing involving De Sousa that would permit her to refute (even if only to USG officials) the allegations which served as the basis for her criminal conviction and determination of civil liability.

50. Upon information and belief, the National Security Council ("NSC") held several meetings to discuss the subject of immunity for the USG officials implicated in the Italian proceedings. Upon further information and belief, Secretary of State Condoleezza Rice (and subsequently Secretary Clinton) and Secretary of Defense Robert Gates desired and intended to invoke diplomatic/consular immunity but CIA Director General Michael Hayden (and subsequently Director Leon Panetta) specifically objected to the idea. Upon

additional information and belief, were it not for the CIA's interference, De Sousa would
have been granted diplomatic/consular immunity by the USG.

51. Upon information and belief, the full spectrum of charges for which De Sousa
was convicted in the Italian criminal proceedings, including the alleged conduct that
forms the basis for the charges, are detailed in De Sousa's personnel and/or security files.

*Actions by Robert Lady, Jeffrey Castelli and Susan Czaska*

52. Lady, who was allegedly the CIA Chief in Milan, Italy, has publicly stated that he
oversaw the CIA's initial monitoring of Abu Omar, including surveilling his activities
and tapping his phones. See *http://www.matthewacole.com/pdfs/Blowback-GQ.pdf* (last
accessed December 14, 2009). Lady has also stated that he planned the details of the
alleged abduction of Abu Omar on February 17, 2003. Id.

53. Lady has stated though that he was merely following orders from his superiors at
the CIA. See *http://www.reuters.com/article/idUSTRE55T3H420090630* (last accessed
December 8, 2009); *http://www.matthewacole.com/pdfs/Blowback-GQ.pdf* (last accessed
December 14, 2009).

54. Specifically, Lady has stated that his immediate superior, Castelli, rejected the
recommendation of both Lady and the CIA Counterterrorism Center to continue the
monitoring operation and instead proposed that Abu Omar be abducted and sent to Egypt
for questioning. See *http://www.matthewacole.com/pdfs/Blowback-GQ.pdf* (last accessed
December 14, 2009).

55. By e-mail dated December 24, 2004, Czaska informed Lady that she had received
an e-mail from an otherwise-unidentified "Maura" entitled "Italy, don't go there" and
which contained a summary of the anticipated upcoming criminal proceedings in Milan.

See *http://survivethejivealive.blog spot.com*. Czaska stated that she feared Lady might be in an Italian jail. Id. Czaska also referenced a separate e-mail that an otherwise-unidentified "Sabrina" had sent to an otherwise-unidentified "Torya" warning her to stay away from Italy and that Lady was in Geneva. The e-mail does not specifically indicate whether "Sabrina" is, in reality, De Sousa.

*The U.S. and International Media Reporting*

56. Media reports on the alleged kidnapping of Abu Omar have been widespread, particularly in Europe and the United States. See generally STEPHEN GREY, GHOST PLANE: THE TRUE STORY OF THE CIA TORTURE PROGRAM (St. Martin's Press, 2006); Matthew Cole, *Blowback*, Gentleman's Quarterly, March 2007; *http://news.bbc.co.uk/2/ hi/europe/6732897.stm* (last accessed on December 8, 2009); *http://www.lefigaro.fr/ international/20060224.FIG000001516_auditions_sur_le_rapt_ d_un_imam_par_la_ cia.html* (last accessed May 10, 2009); *http://www.nytimes.com/2005 /06/26/international / europe/26milan.html?pagewanted=1* (last visited May 12, 2009); *http://www.washing tonpost.com /wp-dyn/content/article/2007/02/27/AR200702270 1160.html* (last visited May 12, 2009). Upon information and belief, in light of the widespread interest in his "Blowback" article, Matthew Cole is set to publish a book in Spring 2010 on the entire Abu Omar controversy.

57. European media outlets have published articles providing inaccurate descriptions of De Sousa, alluding to the notion that she was the principal planner of the alleged kidnapping of Abu Omar. These descriptions have also included depictions of her personality that have included nicknames such as "The Tiger" and "Mata Hari." See e.g. *http://www.corriere.it/Primo_Piano/Cronache/2006/07_Luglio/09/0limipi0.shtml* (last

14

visited May 10, 2009); *http://archiviostorico.corriere.it/2005/luglio/05/ Quei_*

*complimenti_della_Cia_Sismi_co_9_050705038.shtml* (last visited May 10, 2009). Upon

information and belief, Lady was responsible for the inaccurate and defamatory

descriptions in some of these media reports.

*De Sousa's Decision to Resign*

58. By July 2006, having exhausted all available internal mechanisms, De Sousa

began seeking assistance from then-Secretary of State Condoleezza Rice by way of

written letters. Specifically, she requested that the USG formally invoke

diplomatic/consular immunity with respect to De Sousa's alleged involvement in the

kidnapping of Abu Omar and provide her with legal representation to counter the charges

in the Italian criminal proceedings. She never received a response.

59. In March 2008, having not seen her family for over a year, De Sousa used her

available annual leave and traveled to India.

60. In October 2008, De Sousa wished to visit her family in India again. She sought

permission to travel using annual leave hours, but her request was denied. She was

informed that any travel arrangements she made outside of the United States could

jeopardize both her safety and that of other USG officials. Specifically, De Sousa was

informed that the pending Italian criminal proceedings and EUROPOL warrant raised the

risk of her possible arrest and extradition to Italy. It was De Sousa's understanding that if

she traveled to India in any capacity, she would risk disciplinary action, including

termination of her employment.

61. After the inauguration of President Barack Obama and the appointment of

Secretary Clinton, De Sousa attempted one last time to seek assistance with respect to the

15

criminal proceedings in Italy. In a letter to Secretary Clinton which De Sousa also

forwarded to U.S. Attorney General Eric Holder and several Congressional committees,

De Sousa emphasized the need for assistance by noting that her ability to travel to India

to visit her family had been restricted specifically because of the pending criminal

proceedings. De Sousa did not receive a response from Secretary Clinton.

62. De Sousa did submit separate letters to several Congressional oversight

committees and participated in meetings with those committees in order to discuss the

manner in which she had been treated by the USG.

63. To date, there is still a pending EUROPOL warrant for De Sousa's arrest. If she

attempts to enter any country within the European Union, she faces immediate arrest and

transfer to Italian authorities. If she enters into any other countries, she risks the

possibility that those countries will choose to arrest and extradite her to Italy. In effect,

De Sousa runs the risk of arrest and imprisonment if she ever leaves the territorial

sovereignty of the United States. She also faces the imposition of civil monetary liability

by way of the related civil proceeding in Italy, as well as here in the United States.

64. In addition, De Sousa will be required to list her criminal conviction, the

EUROPOL warrant, and even Abu Omar's civil suit against her on even the most

rudimentary job applications and background investigation forms, thereby severely

restricting her options for future employment in her chosen profession.

65. In effect, as long as the criminal convictions remain valid, De Sousa's ability to

travel and pursue her chosen career is effectively in ruins by no fault of her own.

66. In February 2009, De Sousa made the decision that she could no longer agree to remain an employee of the USG while, at the same time, the USG was refusing to either protect her from the pending Italian criminal proceedings, provide her with legal representation to counter the charges or even permit her to visit her family overseas. Consequently, De Sousa tendered her resignation on February 13, 2009.

**FIRST CAUSE OF ACTION**
**(ADMINISTRATIVE PROCEDURES ACT – DOS/SECRETARY CLINTON)**

67. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

68. Pursuant to Article 1 of the Vienna Convention on Diplomatic Relations ("VCDR"), a "diplomatic agent" is defined as a member of the diplomatic staff of an embassy. Pursuant to Article 1 of the Vienna Convention on Consular Relations ("VCCR"), a "consular officer" is defined as any person entrusted with the exercise of consular functions.

69. In August 1998, De Sousa was assigned to the U.S. Embassy in Rome, Italy as a Political Officer, Second Secretary. Her position fell within the definition of a "diplomatic agent." In May 2001, De Sousa was assigned to the U.S. Consulate in Milan, Italy as a Vice Consular Officer. Her position fell within the definition of a "consular officer."

70. Pursuant to Article 9 of the VCDR, a receiving State may notify the sending State at any time and without explanation that a particular member of the diplomatic staff of the sending State has been declared *persona non grata*. Pursuant to Article 23 of the VCCR, a receiving State may notify the sending State at any time that a consular officer of the sending State has been declared *persona non grata*.

17

71. Pursuant to Article 31 of the VCDR, a diplomatic agent is immune from the criminal jurisdiction of the receiving State. Pursuant to Article 43(1) of the VCCR, a consular officer is immune from the criminal and civil jurisdiction of the receiving State with respect to acts performed in the exercise of consular functions.

72. Pursuant to 2 F.A.M. § 221.1(a), diplomatic agents accredited to a foreign government as ambassadors, or other public ministers, are immune from the jurisdiction of all courts and tribunals of the receiving state whether criminal or civil. They cannot be prosecuted, sued, punished, or compelled to testify in the country to which accredited.

73. Pursuant to 2 F.A.M. § 223.1, the status of consular officers and consular employees is usually governed by the VCCR, which generally provides that officers and employees who are nationals of the sending state are immune from the local jurisdiction for all official acts.

74. Pursuant to Article 39(2) of the VCDR, a diplomatic agent retains residual immunity without limitation of time for acts performed in the exercise of his/her official functions, even after the diplomatic agent ceases activity within the receiving State. Pursuant to Article 53(4) of the VCCR, a consular officer retains residual immunity without limitation of time for acts performed in the exercise of his/her official functions, even after the consular officer ceases activity within the receiving State.

75. Pursuant to Article 32(2) of the VCDR, any waiver of diplomatic immunity by the sending State with respect to a particular diplomatic agent must be express. Pursuant to Article 45(2) of the VCCR, any waiver of consular immunity by the sending State with respect to a consular officer must be express and in writing.

76. Pursuant to 2 F.A.M. § 222.4, when the local authorities refuse to recognize the immunities to which the USG considers its Foreign Service national employees are entitled, chiefs of mission shall make appropriate representations to the local authorities and shall report such action to the Department.

77. On November 4, 2009, De Sousa was criminally convicted and found liable for civil monetary damages concerning her alleged involvement in the alleged kidnapping of Abu Omar.

78. De Sousa's alleged involvement in the alleged kidnapping of Abu Omar, even if true, fell within the scope of her official duties and thereby entitles her to diplomatic/consular immunity.

79. To date, the USG has refused to either invoke or expressly waive diplomatic/consular immunity on behalf of De Sousa.

80. The DOS and Secretary Clinton committed and undertook actions that were arbitrary, capricious and/or an abuse of discretion pertaining to De Sousa, including, but not limited to, their failure to either invoke or expressly waive diplomatic/consular immunity for De Sousa. These acts are unwarranted by the facts, unsupported by substantial evidence and in violation of DOS's regulations, thereby causing De Sousa to suffer legal wrongs under the Administrative Procedures Act.

81.  Alternatively, if the DOS's regulations authorized these policies, then the regulations constitute an unreasonable interpretation of the USG's acceptance of obligations imposed by the VCDR and VCCR.

82. The USG's actions caused and continue to cause De Sousa significant emotional, professional and economic harm, including, but not limited to, the threat of criminal imprisonment and civil liability if she ever leaves the territorial boundaries of the United States.

83. Thus, De Sousa is seeking a declaratory judgment ordering the defendants to affirmatively stipulate whether De Sousa is entitled to diplomatic/consular immunity.

<u>**SECOND CAUSE OF ACTION**</u>
**(FIFTH AMENDMENT LIBERTY INTEREST – DOS/SECRETARY CLINTON)**

84. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

85. As an FSO, De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

86. De Sousa was entitled to all aspects of diplomatic and consular immunity conferred upon diplomatic agents and consular officers for conduct that falls within the scope of their respective employment. The USG provided De Sousa with a valid Diplomatic U.S. Passport for work-related purposes for the duration of her two tours of duty in Italy.

87. De Sousa's alleged involvement in the alleged kidnapping of Abu Omar, even if true, clearly fell within the scope of her official duties and thereby entitles her to diplomatic/consular immunity.

88. By way of their actions, or deliberate inaction, DOS and Secretary Clinton have constructively permitted inaccurate and defamatory information regarding De Sousa to be publicly reported world-wide and to be utilized as a basis for her criminal conviction and civil liability in the Italian proceedings. This information has publicly impugned De Sousa's reputation such that she is broadly precluded from pursuing her chosen profession. The facts regarding De Sousa's conduct are verifiable yet neither DOS or Secretary Clinton have taken any action to verify and/or refute them, nor have they taken any action to formally stipulate whether or not De Sousa is entitled to diplomatic/consular immunity.

89. To that end, DOS and Secretary Clinton have failed to accord De Sousa any semblance of due process and denied her full administrative rights, including an internal name-clearing hearing.

90. With her career in ruins and facing criminal and civil liability in Italy, De Sousa was effectively forced to resign. In effect, the actions of DOS and Secretary Clinton—or lack thereof—caused a constructive adverse change in De Sousa's employment status, culminating in a constructive discharge.

91. The DOS and Secretary Clinton are not authorized to deny an individual "Liberty" without "due process of law" in contravention of the Fifth Amendment. Because De Sousa was not afforded due process rights before or after she was constructively forced to resign, she was deprived of the ability to challenge the accuracy of the evidence underlying the Italian proceedings and which can be found within her personnel and/or security files at DOS.

92. The actions of DOS and Secretary Clinton have consequently automatically excluded De Sousa from participating in her chosen profession. Should De Sousa apply to work for a federal agency or a private civilian employer for a position that requires even the most rudimentary background investigation, she will be forced to reveal that she faces criminal imprisonment and civil liability in Italy. In addition, the USG will disseminate information it maintains about De Sousa's conduct, to include known inaccurate and false information that will adversely impact upon her reputation and chances for additional employment opportunities. As a result, the defendants have effectively stigmatized De Sousa and impugned her reputation, broadly precluded her from pursuing her chosen profession and imposed a "status change" upon her that has implicated her liberty interests.

93. The defendants are not permitted to violate De Sousa's Constitutional rights, as set forth by the Constitution of the United States.

94. As a result, De Sousa has suffered adverse and harmful effects, including but not limited to, lost or jeopardized present or future professional and financial opportunities, as well as the threat of criminal imprisonment and civil liability if she ever leaves the territorial boundaries of the United States.

## THIRD CAUSE OF ACTION
### (FIFTH AMENDMENT/TRAVEL– DOS/SECRETARY CLINTON)

95. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

96. As an FSO, De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

97. De Sousa was entitled to all aspects of diplomatic and consular immunity conferred upon diplomatic agents and consular officers for conduct that falls within the scope of their respective employment. The USG provided De Sousa with a valid Diplomatic U.S. Passport for work-related purposes for the duration of her two tours of duty in Italy.

98.  De Sousa's alleged involvement in the alleged kidnapping of Abu Omar, even if true, clearly fell within the scope of her official duties and thereby entitles her to diplomatic/consular immunity.

99. To date, the USG has refused to either assert or expressly waive diplomatic/consular immunity on behalf of De Sousa.

100. The DOS and Secretary Clinton have failed to accord De Sousa due process and denied her full administrative rights, including an affirmative determination of whether De Sousa is entitled to diplomatic/consular immunity. As a result of the actions of DOS and Secretary Clinton—or lack thereof—De Sousa is no longer able to travel outside the territorial boundaries of the United States, as she risks arrest and criminal imprisonment. Therefore, the DOS and Secretary Clinton have effectively deprived De Sousa of her constitutional liberty interest in travel without due process of the law in violation of the Fifth Amendment.

101. Moreover, De Sousa's inability to travel effectively precludes her from pursuing a career in her chosen field in foreign affairs. Without the ability to travel, De Sousa is unable to obtain numerous jobs in this field, including but not limited to diplomat, envoy, attaché, consultant, and a career in international business.

102. The DOS and Secretary Clinton are not permitted to violate De Sousa's Constitutional rights as set forth by the Constitution of the United States.

103. As a result, De Sousa has suffered adverse and harmful effects, including but not limited to, lost or jeopardized professional and financial opportunities, as well as the threat of criminal imprisonment and civil liability if she ever leaves the territorial boundaries of the United States.

### FOURTH CAUSE OF ACTION
### (WESTFALL ACT/APA - DOJ)

104. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

105. Pursuant to 28 U.S.C. § 1346(b)(1), the U.S. district courts shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

106. Pursuant to 28 U.S.C. § 2679(c), the Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any such damage or injury.

107. Pursuant to 28 U.S.C. § 2679(d)(3), in the event that the Attorney General has refused to certify scope of office or employment, the employee may petition the court to find and certify that the employee was acting within the scope of his office or employment.

108. Pursuant to 28 C.F.R. § 15.4(a), the United States Attorney for the district where the civil action or proceeding is brought, or any Director of the Torts Branch, Civil Division, Department of Justice, is authorized to make the statutory certification that the Federal employee was acting within the scope of his office or employment with the Federal Government at the time of the incident out of which the suit arose.

109. Pursuant to 28 C.F.R. § 15.4(b), the United States Attorney for the district where the civil action or proceeding is brought, or any Director of the Torts Branch, Civil Division, Department of Justice, is authorized to make the statutory certification that the covered person was acting at the time of the incident out of which the suit arose under circumstances in which Congress has provided by statute that the remedy provided by the Federal Tort Claims Act is made the exclusive remedy.

110. Upon information and belief, neither the Attorney General nor an appropriate designee has certified whether De Sousa's alleged involvement in the alleged kidnapping of Abu Omar (if true) fell within the scope of her official duties. That failure constitutes a cognizable harm for which relief may be provided by the Court.

111. The DOJ committed and undertook actions that were arbitrary, capricious and/or an abuse of discretion pertaining to De Sousa, including, but not limited to, the failure to certify whether De Sousa's alleged conduct (if true) fell within the scope of her employment. These acts are unwarranted by the facts, unsupported by substantial evidence and in violation of DOJ's regulations, thereby causing De Sousa to suffer legal wrongs under the Administrative Procedures Act.

112. Alternatively, if DOJ's regulations authorized these policies, then the regulations constitute an unreasonable interpretation of the obligations imposed by The Westfall Act.

113. In light of the Italian criminal conviction, De Sousa remains at risk for extradition by the USG to Italy.

114. In light of the Italian court's determination that De Sousa is liable for civil monetary damages, Abu Omar and his wife could seek to have that determination enforced within a U.S. District Court.

115. Pursuant to 28 U.S.C. § 2679(d)(3), De Sousa is invoking her right to petition the Court, or alternatively the Attorney General, for a determination concerning whether De Sousa's alleged conduct fell within the scope of her employment.

## FIFTH CAUSE OF ACTION
### (FIFTH AMENDMENT LIBERTY INTEREST - CIA)

116. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

117. De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

118. According to published news reports, the CIA, its officers and employees, allegedly engaged in the kidnapping and extraordinary rendition of Abu Omar.

119. According to published news reports, De Sousa was allegedly involved, at a minimum, in the planning stages of the alleged kidnapping and extraordinary rendition of Abu Omar.

120. According to published news reports, De Sousa engaged in this alleged activity in her alleged capacity as a CIA employee.

121. De Sousa's alleged involvement in the alleged kidnapping of Abu Omar in her alleged capacity as a CIA employee, even if true, fell within the scope of her official

duties.

122. If the published news reports are true, the CIA, its officer and employees, authorized and engaged in the conduct which is the subject of the Italian criminal and civil proceedings.

123. To date, the CIA has not publicly commented on the circumstances surrounding the alleged kidnapping of Abu Omar or the Italian criminal and civil proceedings. Upon information and belief, the CIA's refusal to comment helped strengthen the Italian criminal case against her (and the other USG officials).

124. If the published news reports are true, then the CIA's subsequent refusal to comment on the allegations that the operation occurred, let alone verify or refute the extent to which De Sousa was engaged in the alleged conduct, has constructively permitted inaccurate and defamatory information regarding De Sousa to be publicly reported world-wide and utilized as the basis for her criminal conviction and civil liability in Italian proceedings. This information has publicly impugned De Sousa's reputation such that she can no longer pursue her chosen profession. The facts regarding De Sousa's alleged conduct are verifiable yet the CIA has not taken any action to verify and/or refute them, nor have they taken any action to formally stipulate whether or not De Sousa's alleged conduct (if true) fell within the scope of her employment.

125. To that end, the CIA has failed to accord De Sousa any semblance of due process and denied her full administrative rights, including an internal name-clearing hearing.

126. As a direct result of the CIA's alleged actions (or lack thereof), De Sousa's ability to pursue her chosen profession has been categorically ruined and she faces criminal imprisonment and civil monetary judgment if she ever enters into the European Union or another country that has an extradition agreement with the European Union. In effect, the CIA's alleged actions (or lack thereof) caused a constructive adverse change in De Sousa's employment status. Accordingly, De Sousa has been deprived of her liberty interest in working in her chosen profession.

127. The CIA is not authorized to deny an individual "Liberty" without "due process of law" in contravention of the Fifth Amendment. Because De Sousa was not afforded due process rights before or after she was allegedly constructively forced to resign, she was deprived of the ability to challenge the accuracy of the evidence underlying the criminal and civil proceedings in Italy and which can be found within her alleged personnel and/or security files at CIA.

128. The alleged actions of the CIA have consequently automatically excluded De Sousa from participating in her chosen profession. Should De Sousa apply to work for a federal agency or a private civilian employer for a position that requires even the most rudimentary background investigation, she will be forced to reveal that she faces criminal imprisonment and civil liability in Italy. In addition, the USG will disseminate information it maintains about De Sousa's conduct, to include known inaccurate and false information that will adversely impact upon her reputation and chances for additional employment opportunities. As a result, the CIA has allegedly effectively stigmatized De Sousa and impugned her reputation, broadly precluded her from pursuing her chosen profession and imposed a "status change" upon her that has implicated her liberty

interests.

129. As a result, De Sousa has suffered adverse and harmful effects, including but not limited to, lost or jeopardized present or future professional and financial opportunities, as well as the threat of criminal imprisonment and civil liability if she ever leaves the territorial boundaries of the United States.

**SIXTH CAUSE OF ACTION**
**(FIFTH AMENDMENT BIVENS ACTION - LADY)**

130. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

131. De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

132. In particular, De Sousa retained a constitutional right under the Fifth Amendment to the U.S. Constitution to fair and impartial due process concerning any protected liberty interest. De Sousa retained a protected liberty interest in her reputation and her ability to pursue her chosen profession.

133. According to published news reports, the CIA, its officers and employees, allegedly engaged in the kidnapping and extraordinary rendition of Abu Omar.

134. According to published news reports, Lady oversaw the operation in his alleged capacity as the CIA Chief in Milan, Italy.

135. Lady's alleged coordination of the alleged operation and alleged failure to maintain pre and post-operation secrecy concerning those individuals involved subsequently resulted in the Italian criminal and civil proceedings implicating De Sousa. Upon information and belief, Lady also served as a source for some of the media reports

concerning De Sousa's alleged involvement in the alleged operation. The Italian proceedings consequently resulted in an adverse status change in the form of De Sousa's constructively-forced resignation from employment with the USG.

136. All actions allegedly taken by Lady, if true, were taken under the color of federal law in his alleged role as a CIA Chief.

137. A reasonable official would have not have engaged in conduct which allegedly included maintaining classified files on a personal home computer and failing to maintain pre- or post-operation secrecy. A reasonable official would have also concluded that the alleged conduct of Lady stood in contravention of De Sousa's Fifth Amendment liberty interests in her reputation and ability to pursue her chosen profession.

138. Upon information and belief, other alleged actions by Lady were also taken under the color of federal law in which a reasonable official also would not have engaged and which stood in contravention of De Sousa's Fifth Amendment liberty interests.

139. Accordingly, Lady is not entitled to qualified immunity and is liable for his alleged conduct in his personal capacity by way of a <u>Bivens</u> action.

140. As a result of Lady's alleged conduct, De Sousa has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future employment and/or financial opportunities, as well as the threat of criminal imprisonment and civil liability if she ever leaves the territorial boundaries of the United States.

### SEVENTH CAUSE OF ACTION
### (FIFTH AMENDMENT BIVENS ACTION - CASTELLI)

141. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

142. De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

143. In particular, De Sousa retained a constitutional right under the Fifth Amendment to the U.S. Constitution to fair and impartial due process concerning any protected liberty interest. De Sousa retained a protected liberty interest in her reputation and her ability to pursue her chosen profession.

144. According to published news reports, the CIA, its officers and employees, allegedly engaged in the kidnapping and extraordinary rendition of Abu Omar.

145. According to published news reports, Castelli authorized the operation in his alleged capacity as the CIA Station Chief in Rome, Italy.

146. Castelli's alleged authorization of the alleged operation and alleged failure to maintain pre or post-operation secrecy concerning those individuals involved subsequently resulted in the Italian criminal and civil proceedings implicating De Sousa. Those proceedings consequently resulted in an adverse status change in the form of De Sousa's constructively-forced resignation from employment with the USG.

147. All actions allegedly taken by Castelli, if true, were taken under the color of federal law in his alleged role as a CIA Station Chief.

148. A reasonable official would not have engaged in conduct which allegedly included withholding operational information from his superiors and failing to maintain pre- or post-operation secrecy. A reasonable official would have also concluded that the alleged conduct of Castelli stood in contravention of De Sousa's Fifth Amendment liberty interests in her reputation and ability to pursue her chosen profession

149. Upon information and belief, other alleged actions by Castelli were also taken under the color of federal law in which a reasonable official also would not have engaged and which stood in contravention of De Sousa's Fifth Amendment liberty interests.

150. Accordingly, Castelli is not entitled to qualified immunity and is liable for his alleged conduct in his personal capacity by way of a <u>Bivens</u> action.

151. As a result of Castelli's alleged conduct, De Sousa has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future employment and/or financial opportunities, as well as the threat of criminal imprisonment and civil liability if she ever leaves the territorial boundaries of the United States.

## EIGHTH CAUSE OF ACTION
### (FIFTH AMENDMENT BIVENS ACTION - CZASKA)

152. De Sousa repeats the allegations contained in paragraphs 12 through 66 above, inclusive.

153. De Sousa possessed the same constitutional, statutory and regulatory rights as any other federal employee. These include, among other things, the usual rights, privileges and benefits that are accorded federal employees.

154. In particular, De Sousa retained a constitutional right under the Fifth Amendment to the U.S. Constitution to fair and impartial due process concerning any protected liberty interest. De Sousa retained a protected liberty interest in her reputation and her ability to pursue her chosen profession.

155. According to published news reports, the CIA, its officers and employees, allegedly engaged in the kidnapping and extraordinary rendition of Abu Omar.

156. According to published news reports, Czaska sent an e-mail to Lady referencing instructions from De Sousa in her alleged capacity as a CIA employee.

157. Czaska's alleged failure to maintain post-operation secrecy concerning those individuals allegedly involved in the alleged operation contributed to the Italian criminal and civil proceedings implicating De Sousa. Those proceedings consequently resulted in an adverse status change in the form of De Sousa's constructively-forced resignation from employment with the USG.

158. All actions allegedly taken by Czaska, if true, were taken under the color of federal law in her alleged role as a CIA employee.

159. A reasonable official would have concluded that allegedly sending an e-mail from an unclassified email account to another unclassified e-mail account in which an allegedly classified CIA operation is referenced and alleged CIA employees' identities and involvement are revealed would not be authorized or legal. A reasonable official would have also concluded that the alleged conduct of Czaska stood in contravention of De Sousa's Fifth Amendment liberty interests in her reputation and ability to pursue her chosen profession.

160. Upon information and belief, other alleged actions by Czaska were also taken under the color of federal law in which a reasonable official also would not have engaged and which stood in contravention of De Sousa's Fifth Amendment liberty interests.

161. Accordingly, Czaska is not entitled to qualified immunity and is liable for her alleged conduct in her personal capacity by way of a <u>Bivens</u> action.

162. As a result of Czaska's alleged conduct, De Sousa has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future employment and/or financial opportunities, as well as the threat of criminal imprisonment and civil liability if she ever leaves the territorial boundaries of the United States.

WHEREFORE, De Sousa requests that the Court award her the following relief:

(1)  Require the USG to formally certify whether De Sousa's alleged conduct (if true) fell within the scope of her employment;

(2)  Require the USG to formally invoke or expressly waive diplomatic and/or consular immunity on behalf of De Sousa with respect to the Italian criminal and civil proceedings;

(3) Declare and find that defendants DOS and Secretary Clinton violated the Administrative Procedures Act by failing to comply with DOS regulations with respect to invoking or expressly waiving diplomatic and/or consular immunity on behalf of De Sousa;

(4)  Declare and find that defendant DOS violated De Sousa's liberty interest under the Fifth Amendment to the Constitution;

(5) Declare and find that defendant DOS violated De Sousa's liberty interest in traveling and pursuing a career dependent on travel under the Fifth Amendment to the Constitution;

(6) Declare and find that DOJ violated both The Westfall Act and the Administrative Procedures Act by failing to comply with DOJ regulations with respect to certifying whether De Sousa's alleged conduct (if true) fell within the scope of her employment;

(7) Declare and find that the alleged conduct by defendant CIA (if the media reports are true) violated De Sousa's liberty interest under the Fifth Amendment to the Constitution;

(8)  Declare and find that the alleged conduct by defendants Lady, Castelli, and Czaska (if the media reports are true) deprived De Sousa of a protected liberty interest by

impugning De Sousa's reputation and/or depriving her of her ability to pursue her chosen profession and consequently renders Lady, Castelli and Czaska personally liable for monetary damages by way of a Bivens action;

(9) Require DOS and/or CIA to provide De Sousa with a name-clearing hearing in which De Sousa can refute and/or challenge the accuracy of the information underlying the criminal and civil proceedings in Italy;

(10) Invoke its equitable powers to expunge all records or information that are inaccurate, derogatory or infringe upon De Sousa's express or implied constitutional or statutory rights;

(11) Require the defendants to reimburse De Sousa for all associated expenses to resolve these disputes;

(12) Award De Sousa the costs of the action and reasonable attorney fees under the Equal Access to Justice Act, 5 U.S.C. § 552a(g)(4)(B), or any other applicable law; and

(13)  Grant such other relief as the Court may deem just and proper.

Date:  December 22, 2009

Respectfully submitted,

/s/

_____
Bradley P. Moss, Esq.
D.C. Bar #975905
Ilana S. Greenstein, Esq.
D.C. Federal Bar #MD9622
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 907-7945