**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| SABRINA DE SOUSA, |
| Plaintiff, |
| v. |
| DEPARTMENT OF STATE, *et al.* |
| Defendants. |

Civil Action No. 09-00896 (BAH)

**MEMORANDUM OPINION**

According to media reports, on February 17, 2003, United States and Italian intelligence agents kidnapped an Islamic cleric and suspected terrorist named Hassan Mustafa Osama Nasr, also known as "Abu Omar," in Milan, Italy and flew him to Egypt, where he was interrogated and tortured.  Although both U.S. and Italian government agents allegedly carried out this "extraordinary rendition" of Abu Omar, an Italian prosecutor launched a criminal investigation in 2004 into the alleged kidnapping.  The plaintiff in this case, Sabrina De Sousa, is a former employee of the U.S. State Department who was assigned to the U.S. consulate in Milan at the time of the alleged Abu Omar kidnapping.  She returned to the United States in early 2004 after finishing her tour of duty in Italy.  Subsequently, the Italian prosecutor charged her and others with allegedly participating in planning the Abu Omar operation on behalf of the Central Intelligence Agency ("CIA").  While the plaintiff denies having any involvement in the alleged kidnapping of Abu Omar, she was convicted *in absentia* in an Italian criminal proceeding in 2009 and sentenced to five years in prison.  The plaintiff brought this civil lawsuit against the State Department and the CIA alleging, *inter alia*, that these agencies violated her constitutional rights by failing to assert diplomatic or consular immunity on her behalf in the Italian courts and by allowing defamatory information about her to spread unchecked.  The government agencies

have moved to dismiss the plaintiff's lawsuit.  The plaintiff opposes the motion to dismiss and

has moved for leave to file a Second Amended Complaint.  For the reasons explained below,

the motion to dismiss is granted and leave to file a Second Amended Complaint is denied.

## I.    BACKGROUND

The plaintiff filed the initial Complaint in this case on May 14, 2009.  ECF No. 1.  The

plaintiff subsequently filed a First Amended Complaint, with leave of the Court, over a year

later, on June 4, 2010.  Am. Compl., ECF No. 17.  The Amended Complaint alleges the

following facts.

### A.    Factual Background

The plaintiff is a naturalized U.S. citizen born in India who served as a Foreign Service

Officer for the U.S. State Department from 1998 to 2009.  Am. Compl. ¶ 3.  In August 1998,

she was assigned to the U.S. Embassy in Rome, Italy as a Political Officer, Second Secretary.

*Id.* ¶ 17.  In May 2001, she was transferred to the U.S. Consulate in Milan as a Vice Consular

Officer for a tour of duty scheduled to end in May 2004.  *Id.* ¶ 18.  Her employer provided her

with a United States government diplomatic passport that explicitly stated that she was abroad

on a diplomatic assignment.  *Id.*

On February 17, 2003, the plaintiff was vacationing at a ski resort in Madonna di

Campiglio, Italy, approximately 130 miles from Milan, Italy.  *Id.* ¶ 19.  According to news

reports, on that same day, U.S. and Italian intelligence agents kidnapped Abu Omar in Milan

and, in an act of "extraordinary rendition," transported him to Egypt, where he was interrogated

and tortured.  *Id.* ¶¶ 20-21.

In January 2004, the plaintiff's tour of duty in Italy ended and she returned to the United

States, where she continued to work for the State Department.  *Id.* ¶ 23.

In April 2004, an Italian prosecutor opened a criminal investigation into the alleged kidnapping of Abu Omar. *Id.* ¶ 24. Primarily by analyzing cell phone records, the prosecutor uncovered substantial evidence allegedly revealing that the CIA coordinated the abduction of Abu Omar with Italian intelligence agents. *Id.* ¶¶ 24-28. The investigation eventually led the prosecutor to search a villa belonging to Robert Seldon Lady, allegedly the CIA station chief in Milan. *Id.* ¶¶ 29, 52. That search yielded evidence tying Lady to the rendition. *Id.* ¶ 29.

In July 2006, the prosecutor issued an arrest warrant for De Sousa, whom he identified as one of the four U.S. officials mainly responsible for the alleged kidnapping. *Id.* ¶ 31. The warrant against De Sousa is a EUROPOL warrant, meaning that if she attempts to enter any country in the European Union, she faces immediate arrest and transfer to Italian authorities. *Id.* ¶ 63. Countries outside the European Union could also choose to arrest and extradite her to Italy. *Id.* Arrest warrants were also issued for several other alleged U.S. and Italian agents. *Id.* ¶ 31. Around the time that her arrest warrant was issued, the plaintiff wrote to then-Secretary of State Condoleeza Rice requesting that the U.S. government invoke diplomatic or consular immunity with respect to her alleged involvement in the kidnapping of Abu Omar and provide her with legal representation to counter the charges in the Italian criminal case. *Id.* ¶ 58. She did not receive any response. *Id.*

Abu Omar ultimately was not charged with a crime and was released in February 2007. *Id.* ¶ 30. That same month, an Italian judge indicted 26 U.S. government officials, including the plaintiff, for their alleged roles in the kidnapping. *Id.* ¶ 32. Six Italian officials were also charged. *Id.* ¶ 34. Abu Omar, for his part, filed a separate civil suit in Italy. *Id.* ¶ 32. The plaintiff's employer instructed the plaintiff not to communicate with her Italian government-appointed defense lawyer or with the media. *Id.* ¶ 40.

In October 2008, the plaintiff requested approval from her employer to take a vacation to visit family members in India, but the request was denied because of concern that the outstanding EUROPOL warrant for De Sousa might lead to her arrest and extradition to Italy. *Id.* ¶ 60.

In early 2009, the plaintiff again wrote to the Secretary of State – by then Hillary Clinton – requesting official government assistance with the Italian case, but she again did not receive a response. *Id.* ¶ 61. On February 13, 2009, the plaintiff resigned from her employment with the U.S. government. *Id.* ¶ 66.

In August 2009, approximately three months after the plaintiff's filing of this action in May 2009, the U.S. government agreed to provide the plaintiff with defense counsel in Italy. *Id.* ¶ 44.

On November 4, 2009, the Italian judge issued convictions for 23 of the U.S. officials charged with involvement in the Abu Omar rendition, including the plaintiff, who was sentenced to five years in prison. *Id.* ¶ 38. Lady received a sentence of eight years. *Id.* The Italian judge found that a third alleged CIA operative, Jeffrey Castelli, the alleged CIA station chief in Rome, could not be convicted because he possessed diplomatic immunity. *Id.* The plaintiff's conviction is currently on appeal in Italy. Hr'g Tr. at 16-17, Sept. 16, 2011.

Abu Omar separately obtained a $1.5 million civil judgment against the plaintiff and other U.S. officials. Am. Compl. ¶ 39.

B.      **The Instant Complaint**

At the time of filing, the First Amended Complaint alleged claims against the Department of State, the Secretary of State, the Department of Justice, and the CIA (collectively, the "agency defendants"). The First Amended Complaint also alleged claims

4

against three individuals:  Robert Seldon Lady, Jeffrey Castelli, and Susan Czaska, another

alleged CIA agent.  *Id.* ¶¶ 8-10.

The first cause of action in the Amended Complaint claimed that the State Department

violated the Administrative Procedure Act by failing "to either invoke or expressly waive

diplomatic/consular immunity for De Sousa."  *Id.* ¶ 80.

The second cause of action claimed that the State Department deprived De Sousa of

liberty without due process of law in violation of the Fifth Amendment to the U.S. Constitution.

*Id.* ¶¶ 84-94.   Specifically, the plaintiff alleged that the State Department "constructively

permitted inaccurate and defamatory information regarding De Sousa to be publicly reported

world-wide and to be utilized as a basis for her criminal conviction," and that "[t]his information

has publicly impugned De Sousa's reputation such that she is broadly precluded from pursuing

her chosen profession."  *Id.* ¶ 88.  The State Department allegedly "failed to accord De Sousa

any semblance of due process and denied her full administrative rights, including an internal

name-clearing hearing," and, as a result, "De Sousa was effectively forced to resign."  *Id.* ¶¶ 89-

90.  "Because De Sousa was not afforded due process rights before or after she was

constructively forced to resign, she was deprived of the ability to challenge the accuracy of the

evidence underlying the Italian proceedings and which can be found within her personnel and/or

security files at [the State Department]."  *Id.* ¶ 91.  The plaintiff concludes that the State

Department has "consequently automatically excluded De Sousa from participating in her chosen

profession," depriving her of a liberty interest in pursuing her chosen profession.  *Id.* ¶ 92.

The third cause of action claimed that the State Department violated the plaintiff's Fifth

Amendment right to travel.  *Id.* ¶¶ 95-103.  According to the Amended Complaint, as a result of

the State Department's actions, including failing to waive or assert immunity for De Sousa, she

is "no longer able to travel outside the territorial boundaries of the United States, as she risks arrest and criminal imprisonment." *Id.* ¶ 100.

In the fourth cause of action, pled against the Department of Justice under the Westfall Act, 28 U.S.C. § 2679(d)(3), the plaintiff purported to invoke "her right to petition the Court, or alternatively the Attorney General, for a determination concerning whether De Sousa's alleged conduct fell within the scope of her employment." *Id.* ¶ 115.

The fifth cause of action, similar to the second cause of action, pled a claim for a Fifth Amendment due process liberty interest violation based on the preclusion of her ability to pursue her chosen profession. *Id.* ¶¶ 116-29. This count, however, is premised upon De Sousa's "alleged capacity as a CIA employee," as conveyed in news reports, and is therefore targeted at the CIA, rather than the State Department. *Id.*

Finally, the sixth, seventh, and eighth causes of action allege claims under the *Bivens* doctrine against the three individual defendants, respectively, for purported violations of De Sousa's Fifth Amendment rights. *Id.* ¶¶ 130-162.

The Amended Complaint asked the Court for various injunctive and declaratory relief, including requiring the U.S. government to "formally invoke or expressly waive diplomatic and/or consular immunity on behalf of De Sousa with respect to the Italian criminal and civil proceedings," ordering the defendants "to expunge all records or information that are inaccurate, derogatory or infringe upon De Sousa's express or implied constitutional or statutory rights," and awarding the plaintiff reimbursement of expenses and attorney's fees. *Id.* at 34-35.

### C.      Response To The First Amended Complaint And Disputes Over Classified Information

On August 19, 2010, the agency defendants and the individual defendants filed separate motions to dismiss the First Amended Complaint.  ECF Nos. 22, 23.

After obtaining extensions of the time period in which to respond to these motions to dismiss, in November 2010, the plaintiff filed a motion for a stay of briefing and requested that the Court hold an *in camera* discussion at which the plaintiff could disclose classified information to the Court.  ECF No. 38.  At this point, a protracted dispute over the plaintiff's desire to disclose classified information ensued.  The defendants opposed the plaintiff's motion for two primary reasons.  *See* ECF No. 33. The defendants argued, first, that a motion to dismiss should be decided based upon the sufficiency of the factual allegations in the complaint alone, without extraneous evidence, and, second, that, in any event, the plaintiff did not have authority to disclose classified information to the Court.  *See id.*  The plaintiff's counsel countered that the disclosure of classified information was necessary to provide the Court with a fully candid response to the arguments raised in the defendants' motions to dismiss.

While the plaintiff's request for an *in camera* session was pending, this case was reassigned to the undersigned presiding judge on January 20, 2011.  The parties filed completed briefing on the motion for an *in camera* session with the Court on March 11, 2011.  *See* ECF No. 39.  The Court subsequently set a status conference and oral argument on the motion for *in camera* session for May 26, 2011.

At oral argument, the plaintiff's counsel expressed his view that he could not candidly and completely respond to the pending motions to dismiss without revealing certain unspecified classified information.  He also stated that he would be hesitant to attempt to prepare an

unclassified response to the motions to dismiss for fear that the agency defendants could deem part of the response to be classified and, consequently, could revoke his security clearance based on alleged unauthorized disclosure of classified information.  As the basis for this concern, the plaintiff's counsel referred to an episode in which, out of an abundance of caution, he had requested and obtained access to a secure computer system from the Department of Justice Litigation Security Group in order to draft the plaintiff's motion for an *in camera* session.  According to plaintiff's counsel, in response to his use of this secure computer system, counsel for the agency defendants reported him for a security violation and sent him a "disparaging" letter.  *See* ECF No. 45 at 4-5 & n.4.

On May 26, 2011, following oral argument, the Court issued an order denying without prejudice the request for an *in camera* session.  Instead, the Court instructed the plaintiff to file oppositions to the pending motions to dismiss by July 11, 2011, and, within the opposition memoranda, to "note the specific legal issues for which resolution, in the plaintiff's view, requires the Court to assess facts that implicate classified information."  ECF No. 40.  The Court further advised that the "plaintiff shall identify the need to rely on classified information with respect to any particular claim as precisely as possible without disclosing any classified information."  *Id.*  In the Court's view, while the Court has the authority to permit or direct the disclosure of classified information in a civil case, it should only do so where the information is material to the resolution of disputed legal issues and where alternatives to reliance upon classified information are inadequate to satisfy the interests of justice.[1]  Finally, the Court ordered the agency defendants to "provide logistical support to the plaintiff's counsel that would

---

[1] *See* further discussion *infra*.

enable the plaintiff's counsel to prepare opposition papers in a manner that will minimize the risk

of inadvertent disclosure of classified information." *Id.* The Court noted that "[s]uch logistical

support may include making a secure computer available for the plaintiff's counsel to use in

drafting his submissions to this Court." *Id.* The purpose of this part of the Court's order was to

facilitate the Court's receipt of the plaintiff's unclassified opposition memoranda in light of

plaintiff's counsel's concerns that he might jeopardize his security clearance if any part of the

plaintiff's opposition brief were deemed classified by the agency defendants, notwithstanding the

best efforts of counsel to include only unclassified information.[2]

On June 24, 2011, in response to an order of the Court requesting an explanation for

certain redactions made to the plaintiff's submissions in support of the motion for *in camera*

session, the agency defendants filed an *in camera*, *ex parte* submission that informed the Court

of certain classified information concerning this action. The agency defendants did not inform

the plaintiff of the contents of the June 24, 2011 *ex parte* submission at the time it was filed.

On July 8, 2011, a few days before the plaintiff's oppositions to the motions to dismiss

were due, the plaintiff filed a motion for a status conference and stay of proceeding. ECF No.

45. This motion stated that the agency defendants had declined to provide plaintiff's counsel

with any additional logistical support, in contravention of the Court's prior order, and that

plaintiff's counsel was unwilling to risk preparing the opposition to the motion to dismiss on an

unsecure computer system, given the possible repercussions to his own security clearance. *See*

*id.* The agency defendants responded, in effect, that they felt that they had offered the plaintiff

---

[2] Counsel's concerns that information he considered unclassified might be deemed classified by the agency
defendants were hardly unwarranted. As part of an administrative process, all of the plaintiff's submissions in this
action have been subject to classification review prior to their filing with the Court. Despite the fact that plaintiff's
counsel, in the Court's view, has endeavored in good faith not to include any classified information in these filings,
the agency defendants have redacted various parts of the plaintiff's submissions.

9

all the support necessary to protect classified information in this case, and that this determination was essentially theirs to make since any relevant classified information originated with the Executive Branch in the first place and the agency defendants were, consequently, in the best position to assess the appropriate safeguards.  *See* ECF No. 46.

The Court held a status conference in chambers on August 31, 2011 to discuss how to move this case toward resolution.  The Court set a date in mid-September for oral argument on the pending motions to dismiss.  The Court further suggested that if the parties could not agree on mutually acceptable logistical procedures for the drafting of the plaintiff's unclassified opposition briefs, then plaintiff's counsel could respond orally to the motions to dismiss in a sealed court session in the presence of only the presiding judge, opposing counsel, and security-cleared court staff.  This sealed session, intended to be unclassified, would minimize any risk of inadvertent disclosure of classified information associated with the use of unsecure computer systems.  In addition, if the Court found disclosure of classified information to be warranted, the Court could transition immediately into a classified *in camera* session.[3]

### D.   The September 16, 2011 Oral Argument

On September 15, 2011, the agency defendants publicly filed a notice to the Court explaining that they had informed plaintiff's counsel about one item of classified information contained in the agency defendants' June 24, 2011 *ex parte* submission, and that all parties could now reference this particular item of classified information by simply "referring generically" to the public notice.  ECF No. 51.  The next day, on September 16, 2011, the Court held oral argument on the pending motions to dismiss.  Although the Court was prepared to hold a sealed

---

[3] The agency defendants indicated that it was beyond the power of the Court to sanction the disclosure of classified information, even in such an *in camera* classified session, and that they would immediately appeal any decision by the Court to authorize such disclosure.

session as described above, both parties indicated at the outset of the hearing that they were not requesting a sealed session and that the Court should proceed in open session.  Hr'g Tr. at 7-9, Sept. 16, 2011.  Accordingly, the oral argument took place in open court.

At oral argument, the plaintiff's counsel explained that the classified information referenced in the government's September 15, 2011 public notice was "one of the key aspects of what was causing me a lot of concern" with respect to the need to inform the Court of classified information.  *Id.* at 13.  The plaintiff also voluntarily conceded several causes of action in the First Amended Complaint.   First, the plaintiff conceded all claims against the three individual defendants (Counts 6, 7, and 8).  *Id.* at 6-7.  Second, the plaintiff conceded the Administrative Procedure Act claim based on the State Department's alleged failure to assert or waive diplomatic or consular immunity (Count 1) and the Westfall Act claim against the Department of Justice (Count 4).  *Id.*  The plaintiff also dropped the right to travel claim (Count 3) as an independent cause of action, but has continued to rely on the alleged restriction on her ability to travel as part of her remaining due process liberty interest claims.  *Id.* at 45-46.  These due process claims – Counts 2 and 5 – against the State Department and the CIA, respectively, were the only claims that the plaintiff did not withdraw.  For these remaining claims, the plaintiff insisted at oral argument on the need to disclose classified information to respond effectively to the motion to dismiss, but the plaintiff did not provide the Court with much greater clarity as to how classified information might affect the evaluation of the legal viability of the claims.  Most specifically, plaintiff's counsel stated that proof of the plaintiff's alleged constructive discharge and what led to it would require disclosure of classified information.  *See id.* at 56.  The plaintiff also indicated that she would be moving for leave to file a Second Amended Complaint that

would itself include classified information. *Id.* at 23-32. The defendants continued to oppose the plaintiff's request to disclose classified information in any format.

Following oral argument, on September 16, 2011, the Court issued a Minute Order directing the plaintiff to file (1) a summary legal memorandum of points and authorities in opposition to the agency defendants' motion to dismiss the two remaining counts of the First Amended Complaint; (2) a written motion for leave to amend the complaint; and (3) "a list of the discrete legal issues, identified at the motions hearing, for which the plaintiff believes disclosure of classified information to the Court is necessary." The Court also ordered the agency defendants to file responses to those documents.

### E.     The Instant Motions

The plaintiff subsequently provided the documents requested in the Court's September 16, 2011 Minute Order. ECF Nos. 53-55. The defendants filed their responses, ECF Nos. 58-60, and the plaintiff had a further opportunity to reply, ECF Nos. 63-64. With briefing finally completed, the Court is now prepared to rule on the agency defendants' motion to dismiss the two remaining counts of the First Amended Complaint and the plaintiff's motion for leave to file a Second Amended Complaint. For the reasons explained below, the motion to dismiss is granted and leave to file a Second Amended Complaint is denied.

## II.     MOTION TO DISMISS

### A.     Legal Standards

### 1.     Motion To Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6).  Although detailed factual

allegations are not required, the Complaint must set forth "more than an unadorned, the

defendant-unlawfully-harmed-me accusation," *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009),

and may not merely state "a formulaic recitation of the elements of a cause of action." *Twombly*,

550 U.S. at 555.  Instead, the Complaint must plead facts that are more than "merely consistent

with" a defendant's liability; "the plaintiff [must plead] factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129

S.Ct. at 1949 (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 556).

### 2.      Motion To Dismiss Under Rule 12(b)(1)

A court must dismiss a case when it lacks subject matter jurisdiction.  *McManus v.

District of Columbia*, 530 F. Supp. 2d 46, 62 (D.D.C. 2007). "Plaintiff bears the burden of

proving subject matter jurisdiction by a preponderance of the evidence."  *Am. Farm Bureau v.

U.S. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000); *accord Lujan v. Defenders of Wildlife*, 504

U.S. 555, 561 (1992).  It is well established that, in deciding a motion to dismiss for lack of

subject matter jurisdiction, a court must construe the allegations in the Complaint liberally but

"need not accept factual inferences drawn by plaintiffs if those inferences are not supported by

facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions."

*Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006); *see also Hohri v. United

States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  The

Court must be assured that it is acting within the scope of its jurisdictional authority and

therefore must give the plaintiffs' factual allegations closer scrutiny when resolving a Rule

12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.

*See Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Westberg v. FDIC*, 759 F.

Supp. 2d 38, 41 (D.D.C. 2011); *Dubois v. Wash. Mut. Bank*, No. 09-2176, 2010 WL 3463368, at

*2 (D.D.C. Sept. 2, 2010); *Hoffman v. District of Columbia*, 643 F. Supp. 2d 132, 135-36

(D.D.C. 2009); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14

(D.D.C. 2001). In evaluating subject matter jurisdiction, the Court, when necessary, may look

outside the Complaint to "undisputed facts evidenced in the record, or the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l

Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404,

413 (5th Cir. 1981)); *see also Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C.

2005).

### 3.      Political Questions Doctrine

"It is emphatically the province and duty of the judicial department to say what the law

is, but some questions, in their nature political, are beyond the power of the courts to resolve."

*El-Shifa Pharm. Indus. Co*. v. *United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (internal

quotations, citations, and alteration omitted). "That some governmental actions are beyond the

reach of the courts reflects the Constitution's limitation of the 'judicial power of the United

States' to 'cases' or 'controversies.'" *Id.* (quoting U.S. Const. art. III). "It is therefore familiar

learning that no justiciable 'controversy' exists when parties seek adjudication of a political

question." *Id.* at 841 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)). In *Baker v.

Carr*, the Supreme Court explained that a claim presents a political question if it involves:

> [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding without
> an initial policy determination of a kind clearly for nonjudicial discretion; or [4]
> the impossibility of a court's undertaking independent resolution without
> expressing lack of the respect due coordinate branches of government; or [5] an
> unusual need for unquestioning adherence to a political decision already made; or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).  "To find a political question, we need only conclude that one [of these] factor[s] is present, not all." *El-Shifa*, 607 F.3d at 841 (quoting *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)).  Courts often treat non-justiciable political questions as going beyond the subject matter jurisdiction of federal courts.  *See id.* at 840 (explaining that the political questions doctrine reflects the limitation of the "judicial power of the United States" to "cases" or "controversies.").  In some cases, however, courts have treated the non-justiciability of political questions as a basis for dismissal that is distinct from subject matter jurisdiction.  *See Oryszak v. Sullivan*, 576 F.3d 522, 526-27 (D.C. Cir. 2009) (Ginsburg, J., concurring) (discussing the distinction and reviewing case law).

### B.      Analysis

The plaintiff's two remaining claims allege due process liberty interest violations based on the theory that the agency defendants have acted unlawfully to deprive the plaintiff of her liberty interest in pursuing her chosen profession.  The Court will now assess the legal viability of these claims.

### 1.      The Plaintiff Is Not Entitled To Disclosure Of Classified Information.

Before turning to the substance of the plaintiff's claims, the Court will first address the plaintiff's asserted need to present additional classified information to the Court.  The plaintiff continues to maintain that her ability to provide the Court with a satisfactory response to the defendants' motion to dismiss is "significantly limited" due to restrictions on her ability to disclose classified information, and that the "gaps in the [plaintiff's] explanations . . . can be cured by an *in camera* classified filing or hearing . . . ."  Pl.'s Resp. to Court's Minute Order

Dated Sept. 16, 2011 on Matters Relating to the Government's Pending Mot. to Dismiss Counts II and V ("Pl.'s Resp."), ECF No. 54, at 1-2.  The Court finds that it should consider the pending motion to dismiss without affording the plaintiff any additional opportunity to present classified information to the Court for the following reasons.

Neither the Court nor the parties have located authority that directly controls a plaintiff's right to present classified information in a civil action.  In the context of this case, however, there is little functional difference between the plaintiff's right to present classified information to the Court and the Court's ability to require the government to disclose classified information.  The crux of the question is the Court's power to require the government to disclose classified information in litigation.[4]  Upon review of the most pertinent authorities, the Court believes that it has the discretion to order disclosure of classified information to the Court in a civil case where the information is material to the resolution of disputed legal issues and where alternatives to reliance upon classified information are inadequate to satisfy the interests of justice.  *See In re Sealed Case*, 494 F.3d 139, 154 (D.C. Cir. 2007) (noting in a civil case that "nothing in this

---

[4] Even if the Court had granted the plaintiff's motion for an *in camera* session to disclose classified information to the Court, the plaintiff and her counsel still might have risked sanction from the Executive Branch for violation of security agreements that restrict disclosure of classified information.  *See* Hr'g Tr. (rough) at 46, May 26, 2011 (according to plaintiff's counsel, a court order providing logistical support for classified filings "protects the information, but it doesn't protect me from internal discipline.").  The alternative that would more clearly enable the plaintiff and her counsel to avoid violating any such agreements would be for the Court to order the government to disclose the classified information the plaintiff wishes to communicate to the Court.  If the Court had ordered the government to disclose classified information, the government would then have had an opportunity to assert any privileges, such as the state secrets privilege, that the government considered applicable.  Relatedly, greater cooperation between the plaintiff and the government may have also avoided some of the disputes over classified information in this case.  The government asserts that "in the long history of this case, Plaintiff and her counsel have had numerous opportunities to consult with the Government regarding whether information pertaining to this matter is or is not classified," but have not done so.  Defs.' Opp'n at 11. The defendants suggest that it is "quite possible . . . that the information referred to [by the plaintiff as classified] may be discussed in an unclassified way or may, as it turns out, not be classified at all," but that there has been no way for the government to assess this possibility since the plaintiff has "steadfastly refused to provide the Government the opportunity to do so."  *Id.*  Indeed, as with the September 15, 2011 public notice concerning the June 24, 2011 *ex parte* filing, the government may have voluntarily disclosed to the Court the classified information the plaintiff wished to communicate.

opinion forecloses a determination by the district court that some of the protective measures in

[the Classified Information Procedures Act ('CIPA')], 18 U.S.C. app. III, which applies in

criminal cases, would be appropriate, as [plaintiff] urges, so that his case could proceed."); *see*

*also Webster v. Doe*, 486 U.S. 592, 604 (1988) ("[T]he District Court has the latitude to control

any discovery process . . . so as to balance respondent's need for access to proof which would

support a colorable constitutional claim against the extraordinary needs of the CIA for

confidentiality and the protection of its methods, sources, and mission."); 28 C.F.R. § 17.17

(Department of Justice regulation stating that "[i]n judicial proceedings other than Federal

criminal cases where CIPA is used, the Department, through its attorneys, shall seek appropriate

security safeguards to protect classified information from unauthorized disclosure, including. . .

[a] determination by the court of the relevance and materiality of the classified information in

question" and listing other potential safeguards); *cf. Al Odah v. United States*, 559 F.3d 539, 544,

547 (D.C. Cir. 2009) ("[B]efore the district court may compel the disclosure of classified

information, it must determine that the information is both relevant and material . . . [B]efore

ordering disclosure of classified material to counsel, the court must determine that alternatives to

disclosure would not effectively substitute for unredacted access.") (emphasis in original).

In this case, in order to facilitate the Court's determination of whether to hold the *in

camera* classified session requested by the plaintiff, the Court has repeatedly asked the plaintiff

to provide some indication of the relevance of classified information to the legal viability of her

claims.[5]  *See, e.g.*, May 26, 2011 Order ("[T]he plaintiff shall note the specific legal issues for

---

[5] Under CIPA, a criminal defendant who intends to rely on classified information must provide notice of that intention to the United States and to the Court, including "a brief description of the classified information."  18 U.S.C. app. III, § 5.  The United States may then request a hearing "to make all determinations concerning the use, relevance, or admissibility of classified information . . . ." *Id.* § 6.  In this case, despite the Court's requests and the

which resolution, in the plaintiff's view, requires the Court to assess facts that implicate

classified information.  The plaintiff shall identify the need to rely on classified information with

respect to any particular claim as precisely as possible without disclosing any classified

information."). Given plaintiff's counsel's concerns about preparing a written memorandum to

provide the Court with greater specificity regarding the plaintiff's need to rely on classified

information, the Court offered to hold a closed session of Court before security-cleared personnel

during which plaintiff's counsel could provide the information orally. Plaintiff's counsel

affirmatively declined the invitation to participate in such a closed session.  Hrg. Tr. at 7-9, Sept.

16, 2011. In its Minute Order dated September 16, 2011, the Court again sought clarity regarding

the plaintiff's purported need to rely on classified information by requiring the plaintiff to file "a

list of the discrete legal issues, identified at the motions hearing, for which the plaintiff believes

disclosure of classified information to the Court is necessary." The plaintiff responded that "her

ability to comply with this particular portion of the Court's Order is severely limited due to

restrictions known to this Court" and, with respect to Counts 2 and 5 of the First Amended

Complaint, the plaintiff noted only the following generic issue as one requiring classified

disclosures: "De Sousa's Presentation To The Court Of Evidence Concerning Her Current Fifth

Amendment Claims (as well as any amended Fifth Amendment claims)."  This extremely

generalized response did not provide the Court with any further information about the relevance

of classified information to the plaintiff's existing claims.[6]  Moreover, the plaintiff's counsel

---

procedures suggested by the Court, the plaintiff has not provided any description, even in broad strokes, of the
classified information she seeks to rely upon.
[6] Insofar as the plaintiff's counsel stated at oral argument that classified information was necessary to provide the
details of the plaintiff's alleged constructive discharge and what led to it, *see* Hr'g Tr. at 56, Sept. 16, 2011, the
Court finds that such information is not necessary for the Court's decision on the pending motion to dismiss.  As

indicated at oral argument that "one of the key aspects of what was causing . . . a lot of concern"
in terms of the classified information he sought to disclose to the Court had already been
revealed in the government's June 24, 2011 submission.  Hr'g Tr. at 13, Sept. 16, 2011.

While the Court recognizes the difficulty of asking the plaintiff to indicate the relevance
of classified information without actually revealing that information, the Court does not find it
unreasonable to require the plaintiff to indicate, at a minimum, whether additional disclosure
beyond that of the June 24, 2011 submission was necessary and, if so, the potential genre of the
classified information and how it would generally fit into the plaintiff's claims before the Court
orders an *in camera* classified session over the objection of the government.  Moreover, a motion
to dismiss is generally decided solely on the basis of the pleadings.  *See Wheeler v. Georgetown
Univ. Hosp.*, 788 F. Supp. 2d 1, 3 (D.D.C. 2011). The plaintiff here filed her original Complaint
and then subsequently amended the Complaint without raising the need to rely on classified
information.  Accordingly, the Court declines to sanction further inquiry into classified materials
before considering the legal viability of the counts pled in the First Amended Complaint.  The
Court now turns to the merits of those claims.

> **2.      Plaintiff's Entitlement To Diplomatic Or Consular Immunity In Italy Is Non-
>            Justiciable.**

Although the plaintiff dropped her Administrative Procedure Act claim based on the State
Department's alleged failure to invoke or waive immunity on her behalf in the Italian court
proceedings, the plaintiff, to some extent, continues to press the Court to decide whether she was
"entitled" to diplomatic or consular immunity.  *See* Pl.'s Resp. at 4 ("De Sousa seeks only a

---

explained further *infra*, even assuming, *arguendo*, that a constructive discharge occurred, the Court would dismiss
the plaintiff's remaining claims.

judicial determination regarding whether she is entitled, as a matter of fact and/or law, to immunity and the opportunity – whether through an internal name-clearing hearing or the submission of written evidence – to address the allegations in the Italian criminal proceedings to ensure no further harm befalls her here in the United States, particularly with respect to her employment opportunities.").  The plaintiff's entitlement to immunity, however, is a political question that lies beyond the competence of this Court.  *See El-Shifa*, 607 F.3d at 841 ("[N]o justiciable 'controversy' exists when parties seek adjudication of a political question.") (quoting *Massachusetts v. EPA*, 549 U.S. at 516).

The plaintiff appears to argue that the Court should separate the threshold question of the plaintiff's potential eligibility for diplomatic or consular immunity under relevant international treaties from the foreign policy question of whether the United States should have asserted immunity on the plaintiff's behalf in the Italian court.[7]  The Court rejects this argument.  The plaintiff has not presented any authority that would support divorcing the assessment of an individual's potential eligibility for immunity from the ultimate question of entitlement to immunity, which, as discussed below, amounts to a foreign policy determination.  Moreover, the plaintiff has not identified any way that her request for an independent ruling on her eligibility for immunity affects her remaining Fifth Amendment claims.  The plaintiff suggested at oral argument that she wants a judicial ruling on her qualifications for immunity so that she may "articulate to [potential employers] that, instead of being a convicted criminal, she's caught up in . . . political games . . . between the countries. . . ."  Hr'g Tr. at 44, Sept. 16, 2011.  Yet a judicial

---

[7] Such a threshold assessment of the plaintiff's eligibility for immunity would appear to require analysis of questions including, for example, whether the plaintiff's alleged conduct in Italy could be deemed to be "acts performed in the exercise of consular functions."  *See* VCCR, art. 43.1 ("Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions."); *see also id.*, art. 5 (defining consular functions).

ruling on this issue would not be material to the disposition of the plaintiff's Fifth Amendment claims and this Court may not issue advisory opinions on questions that have no bearing on the legal issues before the Court. *See Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) ("Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. Const. art. III, § 2, federal courts are without authority to render advisory opinions or to decide questions that cannot affect the rights of litigants in the case before them.") (internal quotation marks and alteration omitted).

The plaintiff's entitlement (or not) to diplomatic or consular immunity in the Italian proceeding is a non-justiciable foreign policy question. *El-Shifa*, 607 F.3d at 844 ("[C]ourts cannot reconsider the wisdom of discretionary foreign policy decisions."). The relevant international treaties on diplomatic and consular immunity make clear that the immunities set forth in those treaties are to benefit states and not individuals. *See* Vienna Convention on Consular Relations, pmbl., Apr. 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820 (hereinafter, "VCCR") ("[T]he purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States."); Vienna Convention on Diplomatic Relations, pmbl., Apr. 18, 1961, [1972] 23 U.S.T. 3227, T.I.A.S. No. 7502 (hereinafter, "VCDR") ("[T]he purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."). Further, the treaties expressly provide that the state sending the diplomat or consular official may waive any immunity. *See* VCCR, art. 45(1) ("The sending State may waive, with regard to a member of the consular post, any of the privileges and immunities provided for in Articles 41, 43 and 44."); VCDR, art. 32(1) ("The immunity from jurisdiction of diplomatic agents and of persons enjoying immunity under Article

21

37 may be waived by the sending State."); *see also* Restatement (3d) of Foreign Relations Law

of the United States (1987) § 464, cmt. j. ("Immunities under this section, even when they relate

to private acts, are not the personal rights of the individual agent, but are conferred by

international law on the sending state. The immunity therefore may be waived by that state . . .

."). Thus, while the plaintiff contends that there is a "judicially discoverable and manageable

standard that exists to determine whether, as a pure question of fact or law, De Sousa was

entitled to immunity under the applicable international treaties," Pl.'s Resp. at 5, the Court

disagrees. The decision to assert, not to assert, or to waive immunity for U.S. personnel in a

foreign judicial proceeding is a foreign policy question committed to the Executive Branch. *See*

*El-Shifa*, 607 F.3d at 841 ("Disputes involving foreign relations . . . are quintessential sources of

political questions.") (internal quotation marks omitted); *see also id.* (noting that "a lack of

judicially discoverable and manageable standards" is indicative of a non-justiciable political

question) (citing *Baker*, 369 U.S. at 217). While not all claims implicating foreign relations are

non-justiciable political questions, the plaintiff's arguments here do not identify any way in

which the government has violated the provisions of relevant treaties, applicable statutes, or any

other rule of law against which the Court might competently assess the government's conduct.

Rather, the government is alleged to have undertaken an action – the non-assertion of immunity

on behalf of De Sousa in a foreign judicial proceeding – that is within its discretion.

The plaintiff cites several cases where courts have assessed whether an individual is

entitled to diplomatic immunity from prosecution in the United States to argue that judicially

manageable standards for assessing entitlement to immunity do exist. *See* Pl.'s Resp. at 5 (citing

cases). None of these cases, however, involve judicial review of the assertion, non-assertion, or

waiver of diplomatic or consular immunity *by the United States in a foreign judicial proceeding*.

The plaintiff identified no authority that governs the Executive Branch's discretion regarding when to assert immunity on behalf of U.S. diplomats in foreign nations.  In any event, the authorities cited by plaintiff, although inapposite, nonetheless demonstrate substantial deference to and reliance upon the views of the Executive Branch.  *See United States v. Al-Hamdi*, 356 F.3d 564, 569-573 (4th Cir. 2004) ("We give 'substantial deference' to the State Department's interpretation of a treaty, and in the context of diplomatic immunity, the receiving state always has had 'broad discretion to classify diplomats.'"); *Kumari Sabbithi v. Waleed KH N.S. Al Saleh*, 605 F. Supp. 2d 122, 126 (D.D.C. 2009) ("In view of the State Department's determination that the defendants are diplomats and its certification that as diplomats they are immune from suit pursuant to the Vienna Convention, the Court concludes that these defendants are entitled to diplomatic immunity.").

In this case, the plaintiff seeks to challenge an essentially discretionary policy decision of the United States regarding whether to assert immunity for that employee in a foreign nation. This type of claim presents a political question that this Court cannot answer.  *El-Shifa*, 607 F.3d at 843-44 ("The conclusion that the strategic choices directing the nation's foreign affairs are constitutionally committed to the political branches reflects the institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters. . . . We must decline to reconsider what are essentially policy choices . . . .").

**3.    The Plaintiff's Due Process Claim Against The State Department Fails As A Matter Of Law.**

In Count 2 of the First Amended Complaint, the plaintiff alleges that the State Department deprived her of a liberty interest without due process of law by foreclosing her ability to pursue her chosen profession.  Specifically, the plaintiff alleges that the State

Department "constructively permitted inaccurate and defamatory information regarding De Sousa to be publicly reported world-wide and to be utilized as a basis for her criminal conviction."  Am. Compl. ¶ 88.  According to the plaintiff, "[t]his information has publicly impugned De Sousa's reputation such that she is broadly precluded from pursuing her chosen profession."  *Id.*  The State Department allegedly "failed to accord De Sousa any semblance of due process and denied her full administrative rights, including an internal name-clearing hearing," and, as a result, "De Sousa was effectively forced to resign."  *Id.* ¶¶ 89-90.  "Because De Sousa was not afforded due process rights before or after she was constructively forced to resign, she was deprived of the ability to challenge the accuracy of the evidence underlying the Italian proceedings and which can be found within her personnel and/or security files at [the State Department]."  *Id.* ¶ 91.  The plaintiff concludes that the State Department has "consequently automatically excluded De Sousa from participating in her chosen profession," depriving her of a liberty interest in pursuing her chosen profession.  *Id.* ¶ 92.

To state a due process claim based on the defamatory actions of government officials, as the plaintiff attempts here, a plaintiff may proceed under one of two theories: (1) a "reputation-plus" theory; or (2) a "stigma or disability" theory.  *Okpala v. District of Columbia*, No. 09-1948, 2011 WL 4936956, at *2 (D.D.C. 2011) (citing *O'Donnell v. Barry*, 148 F.3d 1126, 1139-40 (D.C. Cir. 1998)).  The reputation-plus theory requires "the conjunction of official defamation and adverse employment action."  *O'Donnell*, 148 F.3d at 1140.  "To state a reputation-plus claim, a plaintiff must allege defamation that is *accompanied* by a discharge from government employment or at least a demotion in rank and pay."  *Evans v. District of Columbia*, 391 F. Supp. 2d 160, 167 (D.D.C. 2005) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983)).  Under the "stigma or disability" theory, a plaintiff must show "the combination of an adverse

24

employment action and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'" *Id.* (quoting *O'Donnell*, 148 F.3d at 1140). This "stigma or disability" claim "differs from a 'reputation-plus' claim in that the complaint turns not on official speech, 'but on a continuing stigma or disability arising from official action.'" *Id.* (quoting *O'Donnell*, 148 F.3d at 1140). "Such a stigma or disability may be found where the official action either (a) automatically bars plaintiff from a specific set of positions within the government, or (b) generally blocks him from pursuing employment in his chosen field of interest." *Id.*

The plaintiff appears to argue that both theories might sustain her due process claim and she relies on her alleged constructive discharge as the adverse employment action or discharge underlying the claim. *See* Pl.'s Resp. at 6-9; *id.* at 6 ("De Sousa can demonstrate that a constructive discharge, even if by way of resignation, can constitute an adverse employment action."). One court in this Circuit, however, has held that a resignation in circumstances constituting a constructive discharge is insufficient as a matter of law to establish a due process liberty interest violation under either theory. *See Evans*, 391 F. Supp. 2d at 168; *see also M.K. v. Tenet*, 196 F. Supp. 2d 8, 15 (D.D.C. 2001) (dismissing a "stigma or disability" claim for failure to meet the threshold of official government action where the plaintiff retired to avoid termination); *but see Hill v. Borough of Kutztown*, 455 F.3d 225, 238 (3d Cir. 2006). Even assuming, *arguendo*, that a constructive discharge could establish a due process liberty interest violation and that the plaintiff has adequately alleged a constructive discharge, the plaintiff's claims in this case would still fail.

The plaintiff's claims fail under the reputation-plus theory because the plaintiff has not alleged any official defamation. The plaintiff argues that "the 'reputation-plus' prong can be

satisfied by demonstrating that particular defamatory information contained within an

individual's personnel file is available to future employers," Pl.'s Resp. at 7, but the plaintiff's

assertion that defamatory information is contained within her personnel file is contradictory at

best.  The plaintiff contends that "[i]nformation regarding the alleged extraordinary rendition,

as well as the details of De Sousa's actual conduct, is contained within her Government

personnel and security files."  Pl.'s Resp. at 7.  Yet even assuming that allegation to be true, the

plaintiff has failed to allege that De Sousa's personnel file contains *false* information about her,

and a statement must be false to be defamatory.  *See Graham v. U.S. Dep't of Justice*, No. 02-

1231, 2002 WL 32511002, at *4 n.2 (D.D.C. Nov. 20, 2002).  To the contrary, this description

alleges that the personnel file reflects "De Sousa's actual conduct."  Pl.'s Resp. at 7.  Moreover,

even if the plaintiff's personnel file did contain false information that could harm her reputation,

there is no allegation that the State Department has ever publicized that information to any third

party, which is also a requisite element of defamation.[8]  *See Graham*, 2002 WL 32511002, at *4

n.2; *see also Orange v. District of Columbia,* 59 F.3d 1267, 1274 (D.C. Cir. 1995) ("[I]njury to

reputation cannot occur in the absence of public disclosure of the allegedly damaging

statements."); *Okpala*, 2011 WL 4936956, at *3 (noting cases that "appear to require allegations

that the defamatory statements were published outside of the Plaintiff's agency under the

---

[8] The plaintiff cites Department of State regulations to suggest that the Department will publicize unspecified defamatory information about the plaintiff, but the Court finds this allegation lacking.  The regulations permit the sharing of information from personnel files only under certain circumstances.  *See* 3 Foreign Affairs § 2352.4-4 ("Authorized officials of other Federal agencies, international organizations, or State and local governments may review [personnel files] in cases where Foreign Service employees are being considered for detail, assignment, or secondment to the agency or organizational entity concerned *when HR/CDA/CDT approves such review*") (emphasis added); *id.* § 2352.4-3 ("[The Office of Personnel Management] may be granted access to the [personnel] files of current or former Foreign Service employees under the same procedures and conditions which apply to access by other non-Foreign Affairs agencies. See 3 FAH-1 H-2350 for procedures and guidelines concerning OPM access to [personnel files].").  The Court finds the existence of these regulations insufficient to demonstrate that any information – let alone false information – will be publicly disclosed about the plaintiff in a way that actually stigmatizes her reputation.  *See Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995).

'reputation-plus' theory of liability").  The plaintiff's reliance on *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092 (D.C. Cir. 1985), is unavailing.  In that case, the plaintiff, a former government attorney discharged for alleged misconduct, stated a claim for relief based on allegations that "the [government's] action and the *subsequent spreading of the charges by [government] officials* had foreclosed future employment opportunities in her preferred field and had 'destroyed her reputation as a competent and capable attorney and as a sober and serious person.'" *Id.* at 1098 (emphasis added).  By contrast, the plaintiff here makes no claim that any actual "spreading" of derogatory information about her was effected by the U.S. government.

Here, the plaintiff has identified the "scope" of the defamatory information supposedly contained in her personnel file and the question of whether "any of the information" in her file has been disseminated as "unresolved questions" appropriate for discovery.  Pl.'s Resp. at 11.  In other words, the plaintiff essentially concedes that she has pled a legal theory of alleged harm without the factual allegations necessary to back up that theory.  Mere speculation that the plaintiff's personnel file may contain derogatory information is not sufficient to sustain a claim, absent some other indicia that the speculation is correct.[9]  In *Peter B. v. CIA*, the plaintiff also alleged a due process liberty interest claim based on defamatory information allegedly contained in the plaintiff's personnel file.  620 F. Supp. 2d 58, 71-74 (D.D.C. 2009).  The court in that case found that the complaint survived a motion to dismiss, even though the information contained in the personnel file remained unknown.  *Id.*  That case, however, involved more detailed claims of actual defamatory statements that may have been adopted by the government agency defendant as the official reason for the plaintiff's termination.  *See id.* at 71.  The complaint there alleged

---

[9] Insofar as the plaintiff suggests that access to classified information would be necessary to explain her defamation allegations fully, the Court finds that classified information, by its very nature, is less likely than unclassified information to be publicly disseminated, which is a necessary element of defamation.

that defendants "Lyons and Does # 1-# 10 took steps based on their own personal reasons to unlawfully and/or unethically ensure Peter B.'s relationship with the CIA was terminated . . . includ[ing], but . . . not limited to, the dissemination of false information concerning Peter B." and that after Peter B.'s termination, "the CIA disseminated false and defamatory information concerning Peter B. to . . . government contractors." *Id.* at 72 n.2. The court denied a motion to dismiss because it found the complaint created a "reasonable inference that the alleged statements disseminated throughout the CIA to cause [the plaintiff's] termination may have been sufficiently defamatory to injure Peter B.'s reputation and may have been adopted as reasons for his termination and subsequently communicated to his potential employers as the reasons for his termination." *Id.* at 72-73. Here, by contrast, the plaintiff has not similarly alleged that actual defamation has occurred, nor could the defendant's employer have adopted any defamatory information as the reason for the plaintiff's termination, since the plaintiff here resigned. Thus, the Court finds that the plaintiff's claim here is subject to dismissal for failure to satisfy the pleading standard. *See Iqbal*, 129 S.Ct. at 1949 ("[T]he plaintiff [must plead] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and not just facts that are "merely consistent with" a defendant's liability) (citing *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

The plaintiff's claim fares no better under the "stigma or disability" theory because she has not alleged any official action by the State Department that has "automatically bar[red] [her] from a specific set of positions within the government, or . . . generally block[ed] [her] from pursuing employment in [her] chosen field of interest." *Evans*, 391 F. Supp. 2d at 167. The plaintiff contends that, in completing job applications, she is now "compelled to reveal the Italian conviction, which she argues occurred as a result of actions or inactions committed by the

28

defendants." Pl.'s Resp. at 7. The Italian conviction, however, was not an official action by the U.S. government that can serve to establish the government's liability for depriving the plaintiff of her right to pursue her profession. The plaintiff has "categorically denie[d] having any involvement in the alleged kidnapping of Abu Omar." Am. Compl. ¶ 33. Assuming that the plaintiff's denial is true, as the Court must in deciding this motion to dismiss, then the Italian court has wrongfully convicted an innocent American foreign service officer of a crime. Yet neither the Italian court's conviction, nor the widespread publication of the allegations against the plaintiff in the international media, can be fairly characterized as official acts of the U.S. government for the purposes of the plaintiff's due process claim. Indeed, these acts are well beyond the government's control.

Insofar as the plaintiff contends that her alleged constructive discharge was the relevant official government action, the Court finds that the plaintiff has not plausibly alleged that this constructive discharge brought about any change in status that implicates the plaintiff's liberty interests. *See Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994) ("The critical question . . . is whether State's [action] has worked a change in [the plaintiff's] status under law, either by (a) automatically excluding her from a definite range of employment opportunities with State or other government agencies; or (b) broadly precluding her from continuing in her chosen career . . . ."). The thrust of the plaintiff's allegations is that her employment opportunities have been foreclosed by the Italian conviction and by her public association with the Abu Omar affair, not by any change in status resulting from the constructive discharge itself. *See* Am. Compl. ¶¶ 88-92. As discussed above, the acts of the Italian court and the international media cannot be attributed to the State Department.

Thus, the plaintiff has not adequately alleged any government action that could serve as a predicate for a "stigma or disability" claim.  The Court therefore need not reach the issue of whether the plaintiff has adequately alleged preclusion from pursuit of her profession.  *See U.S. Info. Agency v. Krc*, 905 F.2d 389, 397-98 (D.C. Cir. 1990) (finding, *inter alia*, that an agency employee who lost international employment opportunities after being deemed a security risk still retained domestic employment opportunities).  In sum, the plaintiff's due process liberty interest claim against the State Department fails as a matter of law.  Accordingly, Count 2 of the Amended Complaint must be dismissed.

### 4.     The Plaintiff's Due Process Claim Against The CIA Fails As A Matter Of Law.

The plaintiff's due process claim against the CIA fails for the same reasons explained above.  The due process claim against the CIA is essentially the same as the claim against the State Department, except that it is premised on the CIA's status as the plaintiff's alleged employer.  *See* Am. Compl. ¶¶ 119, 120, 124 ("According to published news reports, De Sousa was allegedly involved, at a minimum, in the planning stages of the alleged kidnapping and extraordinary rendition of Abu Omar. . . . in her alleged capacity as a CIA employee. . . . If the published news reports are true, then the CIA's subsequent refusal to comment on the allegations that the [Abu Omar] operation occurred, let alone verify or refute the extent to which De Sousa was engaged in the alleged conduct, has constructively permitted inaccurate and defamatory information regarding De Sousa to be publicly reported world-wide and utilized as the basis for her criminal conviction and civil liability in Italian proceedings. This information has publicly impugned De Sousa's reputation such that she can no longer pursue her chosen profession."); *see also* Pl.'s Resp. at 9.  The plaintiff's due process liberty interest claim against the CIA fails as a

matter of law for the same reasons discussed above regarding her claim against the State

Department.  Accordingly, Count 5 of the Amended Complaint must be dismissed as well.

## III.    MOTION TO AMEND THE COMPLAINT

### A.    Legal Standard

"The grant or denial of leave to amend is committed to the sound discretion of the district

court." *Triad at Jeffersonville I, LLC v. Leavitt*, 563 F. Supp. 2d 1, 11 (D.D.C. 2008) (citing

*Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)).  While leave to amend a complaint

should be freely granted when justice so requires, *see* Fed. R. Civ. P. 15(a)(2), the Court may

deny a motion to amend if such amendment would be futile.  *Foman v. Davis*, 371 U.S. 178, 182

(1962); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). "An amendment

would be futile if it merely restates the same facts as the original complaint in different terms,

reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not

withstand a motion to dismiss." *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114

(D.D.C. 2002) (citation omitted).  "Where . . . the complaint, as amended, would radically alter

the scope and nature of the case and bears no more than a tangential relationship to the original

action, leave to amend should be denied." *Miss. Ass'n of Cooperatives v. Farmers Home

Admin.*, 139 F.R.D. 542, 544 (D.D.C. 1991); *see also Nat'l Treasury Emps. Union v. Helfer*, 53

F.3d 1289, 1295 (D.C. Cir. 1995) ("[T]he district court did not abuse its discretion in denying the

amendment, which bore 'only tangential relationship' to the original claim.").

### B.    Analysis

The plaintiff seeks leave to amend the complaint to add "at least five new claims to her

two remaining Counts, both of which also need to be factually amended."  Pl.'s Mem. in Supp.

of Pl.'s Mot. for Leave to File Second Am. Compl. ("Pl.'s Amendment Mem.") at 3. The

plaintiff also proposes to add her counsel, Mark Zaid, as an additional plaintiff in the proposed
Second Amended Complaint.  Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Leave to File Second
Am. Compl. ("Pl.'s Amendment Reply") at 1.  The plaintiff's five proposed new claims seek to
challenge the government's treatment of classified information and to establish the rights of civil
litigants to rely on such classified information.   Specifically, the plaintiff has identified the
proposed new claims as follows:

1.   First Amendment Challenge To The Government's Review Of De Sousa's
Resume

2.   First Amendment Challenge To The Classification Of Certain Information
Referenced In The Government's Notice To Court (dated September 15,
2011) And Allegedly Identified In The Government's June 24, 2011 *ex
parte, in camera* submission

3.   First (And Possibly Sixth) Amendment Challenge To Certain Obligations
Currently Imposed Or Sought To Be Imposed By The Government Upon
The Plaintiff And Her Counsel

4.   First (And Possibly Sixth) Amendment Challenge To The Government's
Refusal To Permit De Sousa's Counsel (Or De Sousa) To Use Secure
Computer Systems To Draft Court Filings

5.   First (And Possibly Sixth) Amendment Challenge To Present Classified
Information To The Court In Civil Proceedings So Long as Proper
Security Precautions Are Taken

Pl.'s Amendment Mem. at 3-4.  For the reasons explained below, the Court will deny the plaintiff leave to file the amended complaint comprising these claims.[10]

First, amendment of the plaintiff's two Fifth Amendment liberty interest claims would be futile because, as explained above, these claims are deficient as a matter of law and cannot survive a motion to dismiss.  *See Robinson v. Detroit News, Inc*., 211 F. Supp. 2d 101, 114 (D.D.C. 2002) (amendment would be futile where amended complaint cannot survive a motion to dismiss).  The only detail the plaintiff has provided about the anticipated amendment of these two claims is that the plaintiff intends to incorporate unspecified classified information into the amended versions.  *See* Pl.'s Amendment Mem. at 3.  As set forth above, the Court previously afforded the plaintiff ample opportunity to provide the Court with at least some description of how classified information would fit in to the plaintiff's existing claims and the plaintiff has not done so.  The plaintiff's existing claims fail as a matter of law and the plaintiff has not provided any inkling of how amendment would save them.  Accordingly, the Court concludes that amendment of those claims would be futile.

That leaves the plaintiff's five proposed new claims, which would drastically alter the nature of this action into a wide-ranging First Amendment litigation concerning the use of classified information.  The current Complaint in this case asserted eight counts seeking to

---

[10] The plaintiff has not provided the Court with a copy of the proposed Second Amended Complaint as required by Local Civil Rule 15.1.  Instead, the plaintiff has filed a motion for an *in camera* status conference to discuss the proposed contents of the Second Amended Complaint because, due to the plaintiff's desire to include classified information in the Second Amended Complaint, "it is just not possible for De Sousa to comply at this time in the actual drafting of her Second Amended Complaint without further guidance from the Court (along with input from the Executive Branch), and possibly the need to first litigate the issue."  Pl.'s Amendment Mem. at 2.  Accordingly, the Court and the agency defendants are left guessing about the content of some of the plaintiff's proposed amendments.  For example, the plaintiff has identified four claims that will "possibly" invoke the Sixth Amendment, but it is unclear how the Sixth Amendment, which applies by its terms "[i]n all criminal prosecutions," is relevant to this *civil* action.  U.S. Const., Amend. VI; *see also* Def.'s Amendment Opp'n at 8 n.5.  Since the Court is denying leave to amend the Complaint for the reasons explained below, the plaintiff's motion for an *in camera* status conference, ECF No. 56, will be denied as well.

challenge the government's actions or inactions toward plaintiff De Sousa in the wake of the

alleged rendition of Abu Omar and the ensuing Italian court proceedings.   The plaintiff

voluntarily dismissed six of those counts and the remaining two counts are deficient as a matter

of law.   Now, by amending the pleadings, the plaintiff seeks to add her counsel as a co-plaintiff

and to transform this case into a broader battle over the scope of a plaintiff's right to use and rely

on classified information in civil actions.   The Court will exercise its discretion to deny leave to

amend in these circumstances because the resulting action would bear only a tangential

connection to the original case.   "Where . . . the complaint, as amended, would radically alter the

scope and nature of the case and bears no more than a tangential relationship to the original

action, leave to amend should be denied."  *Miss. Ass'n of Cooperatives*, 139 F.R.D. at 544; *see

also City of Williams v. Dombeck*, 203 F.R.D. 10, 13 (D.D.C. 2001) (denying leave to amend,

*inter alia*, because "the additional claims set forth in the proposed amended complaint are only

tangentially related to the claims in the original case."); *Wolf v. C.I.A.*, 569 F. Supp. 2d 1, 11

(D.D.C. 2008) (finding "plaintiff's proposed amendments bear no relationship to his original

case and would result in a 'radical' change to the 'scope and nature' of this litigation" where

plaintiff sought to add Administrative Procedure Act claim to Freedom of Information Act case);

*Szymanski v. DEA*, No. 93-1314, 1993 WL 433592, at *2-3 (D.D.C. Oct. 6, 1993) (denying leave

to amend where the proposed amendment "adds additional claims and parties that are unrelated

to what was a straightforward F.O.I.A. dispute.").

   The plaintiff has openly volunteered that each of the "proposed five new claims could be

independently raised in a new action."  Pl.'s Amendment Mem. at 4.  The Court finds that a new

action would indeed be the better mechanism for the plaintiff to raise those claims, if she decides

that course to be prudent.[11]   As this Court observed in *Mississippi Association of Cooperatives*,

"leave to amend should be granted liberally in order to ensure that litigants have their day in

court. . . . Leave to amend here would do far more than allow plaintiff to fully litigate all the

legal dimensions of [its] initial action, it would permit plaintiff to transform [its] case into

something entirely new." 139 F.R.D. at 544.  In such circumstances, denial of leave to amend is

appropriate.

## IV.    CONCLUSION

The facts underlying this case are troubling in many ways.  The plaintiff served the

government and the people of the United States in the Foreign Service for a decade.  During the

course of her service to this country, she was accused and convicted *in absentia* of committing a

crime in a foreign nation, not for any personal gain, but at the alleged behest of the United States

government.  According to her allegations, she requested the government's assistance to counter

the charges against her in Italy, but received none and was instead "[e]ffectively abandoned and

left to fend for herself."  Am. Compl. at 2.  Following her foreign conviction, she faces the risk

of arrest and imprisonment if she travels outside the United States, which is a particular hardship

in her case both because of the impact on her professional options and because she is a

naturalized citizen with family members living abroad.  Then, when the plaintiff sought judicial

review in this Court, the government did little to minimize the "logistical obstacles" presented by

the need to protect against the inadvertent disclosure of classified information, but rather denied

her counsel the use of a secure computer to draft filings and "threatened" the continuation of her

---

[11] The Court does not reach the defendants' arguments that the proposed new claims also fail on the merits.  The Court does note, however, the defendants' argument that litigating the proposed new claims in a different action could actually minimize the need for the plaintiff to rely on classified information in pursuing those claims.  *See* Defs.' Amendment Opp'n at 3-4.

counsel's security clearance.  ECF No. 63 at 13 n.6.  The message that this scenario sends to civilian government employees serving this country on tours of duty abroad is a potentially demoralizing one.

The Court is bound, however, to apply controlling law to the plaintiff's case.  For the reasons set forth above, the Court must grant the agency defendants' motion to dismiss the two remaining counts in the First Amended Complaint (Counts 2 and 5).  In addition, the plaintiff's motion for leave to file a Second Amended Complaint is denied.

An appropriate Order will accompany this Memorandum Opinion.


DATED: January 5, 2012                    /s/  _Beryl A. Howell_

                                          BERYL A. HOWELL
                                          United States District Judge